FILED

APR 11 2019

Clerk, U.S Courts
District Of Montana
Missoula Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SHARON TEAGUE and RANDALL TEAGUE, Individually, and in their official capacity as Co-Personal Representatives of the ESTATE OF MARK RANDALL TEAGUE,<br><br>Plaintiffs,<br><br>vs.<br><br>REMINGTON ARMS COMPANY, LLC, REMINGTON OUTDOOR COMPANY, INC., SPORTING GOODS PROPERTIES, INC., E.I. DU PONT DE NEMOURS & COMPANY, DOES A TO K,<br><br>Defendants. | CV 18–184–M–DLC<br><br>ORDER |

Before the Court is the Motion to Dismiss for Failure to State a Claim (Doc. 3) of Defendants E.I. DuPont De Nemours & Company; Remington Arms Company, LLC; Remington Outdoor Company, Inc.; and Sporting Goods Properties, Inc. (collectively, "Remington"). Remington contends that Plaintiffs Sharon and Randall Teague have failed to state a claim for relief under Montana products liability law, and it asks the Court to dismiss the Teagues' Complaint with prejudice. The Teagues have plausibly alleged that a design defect in a

-1-

Remington rifle caused the death of their son, Mark. Thus, the Court denies the motion.

## BACKGROUND[1]

### I. The Death of Mark Sears

At 6:30 a.m. on the morning of November 3, 2015, 16-year-old Mark Teague was awakened by his mother, Sharon. (Doc. 1 at 11.) Mark's father, Randy, found Mark dozing in a chair in the living room shortly afterward. (*Id.* at 12.) Randy greeted his son and said, "It's time to wake up and get ready for school." (*Id.* at 12.) Mark "responded as he always did." (*Id.*)

Randy went to the bathroom to brush his teeth. (*Id.*) He heard a loud noise and, thinking that something large had fallen, walked into the living room to investigate. (*Id.*) Mark was in the same chair he had been sitting in minutes earlier, his Remington Model 700 bolt action hunting rifle between his knees. (*Id.* at 10–12.) The sound Randy had heard was the rifle firing—Mark had suffered a massive gunshot wound to the face and head, and he was dead. (*Id.* at 12.) The investigating coroner classified the death as suicide. (Doc. 4–1.)

Looking back, Mark's family has not identified risk factors for suicide, and it does not think that it ignored any red flags. The night before his death, Mark

---

[1] For purposes of this Order, the facts are taken from the Complaint and assumed to be true. See *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

watched a Monday night football game with Randy before playing video games, his new kitten curled up in his lap. (Doc. 1 at 11.) Sharon, a school teacher for nearly three decades, is trained to identify risk factors among teens. (*Id.* at 12.) On the morning of Mark's death, she found Mark to be upbeat and free of signs indicating that he may be suicidal. (*Id.*)

Mark had been a successful student, and he was active in his community. (*Id.* at 9–11.) He was playing junior varsity and varsity football during the fall of 2015, and he was also a strong asset to his school's track and field team. (*Id.* at 9.) A member of 4-H since the age of nine, Mark had recently bought a steer to raise. (*Id.*) He also had a summer job at a local ranch, mending fences and putting up hay alongside his brother, Matt. (*Id.*) In the months prior to his death, Mark had not only gotten his driver's license but also inherited his sister's old truck. (*Id.*)

The Teagues were avid hunters, and Mark was gearing up for hunting season in early November 2015. (*Id.* at 10–11.) Mark and Matt had gotten their tags for the 2015 season, and they had sighted in their rifles a few times prior to Mark's death. (*Id.* at 11.) On November 1, 2015, the brothers went out hunting in the rain, to no success—the only thing Mark shot at that day was a squirrel. (*Id.*) When they came home, Mark and Matt stood their guns up along the wall inside the house so that they could dry. (*Id.*)

The family had strict rules about firearm storage and handling, but Mark apparently failed to unload the rifle when he came home on November 1. (*Id.* at 12.) The Teagues allege that Mark remembered that his gun was still loaded on the morning of November 3. (*Id.*) They claim that the gun went off on its own as Mark attempted to unload it.

## II. The Remington Trigger Assembly

The Teagues allege that Mark was killed as a result of his Remington rifle's defective design. They theorize that the gun fired as Mark attempted to unload the rifle on the morning of November 3, even though he did not pull the trigger.

Mark's rifle uses a trigger assembly design known as the Walker Fire Control, which is specific to Remington rifles. (*Id.* at 2.) As shown in the image below, the Walker Fire Control assembly uses a floating trigger "connector" that sits under the sear with a slight overlap. (*Id.* at 14.)



Illustration 2

-4-

Generally, the gun fires when a user pulls the trigger, separating the connector from the trigger itself and allowing the sear to fall. (*Id.* at 13–14.) However, foreign material can build up inside the assembly, preventing the connector from falling precisely into place. (*Id.* at 14.) If the connector does not sufficiently overlap with the sear, the rifle may fire without a trigger pull. (*Id.* at 15–16.)

When the Walker Fire Control was first patented, the inventors acknowledged that, unless the safety mechanism was carefully designed, the assembly presented the possibility of inadvertent firing upon release of the safety. (*Id.* at 17.) In 1956, Remington internally described the two-position safety mechanism it used in its bolt-action rifles as "inadequate." (*Id.*) Remington then developed a three-position safety which allowed users to unload their rifles without taking the safety off. (*Id.* at 17–18.) However, it reverted to the two-safety position rifle shortly thereafter. (*Id.* at 18.)

With only one exception, Remington used the Walker Fire Control in every bolt action rifle it manufactured between 1948 and 2006, at which time it began using a new fire control system, the X-Mark Pro. (*Id.* at 16–18.) Inadvertent firings have occurred in Remington bolt action rifles using the Walker Fire Control throughout this period of time. (*Id.* at 19–29.) Internal documents and memoranda show that Remington was aware of misfirings caused by the Walker

-5-

Fire Control but that it had concerns about the cost-effectiveness of recalling and/or altering the assembly. (*Id.* at 20–27.) Public records confirm that over 140 lawsuits have been filed against Remington alleging serious injury or death resulting from the Walker Fire Control's defective design. (*Id.* at 29.)

## LEGAL STANDARD

A complaint must include a "short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). It need not include "detailed factual allegations," but it must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Where, as here, the defendant tests the sufficiency of the complaint under Rule 12(b)(6), the Court must construe all factual allegations in favor of the plaintiff to determine whether the plausibility standard is met. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). Generally, the analysis at this early stage of litigation focuses on the law rather than the truth of the factual allegations, as dismissal is appropriate only if the plaintiff has not presented a cognizable legal theory or alleged sufficient facts in support of that theory. *Balistreri v. Pac. Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). However, the Court need not

disregard all facts outside of the complaint, and it need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

## DISCUSSION

Remington argues that the Teagues have failed to allege a plausible claim for relief because the Teagues "have not and cannot plead that Mark's rifle fired without a trigger pull." (Doc. 4 at 7.) The Court disagrees. While the Teagues could have alleged more precisely their theory regarding how the rifle fired, they need not utter a magic incantation to survive a motion to dismiss. "Viewing the allegations of the complaint as a whole," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011), and construing those allegations "in the light most favorable to the nonmoving party," *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 681 (9th Cir. 2019) (quoting *Yagman v. Garcetti*, 852 F.3d 859, 863 (9th Cir. 2017)), the Teagues's theory of liability is clear enough. They allege that Mark, a well-adjusted, thriving 16-year-old, did not kill himself at 6:30 a.m. on a routine school day but that his Remington rifle fired into his face when he attempted to unload it, even though he did not pull the trigger.

The Teagues have brought two claims—a claim for products liability, and a derivative claim for punitive damages. Because they have no freestanding claim for punitive damages, the only issue at this stage of litigation is whether they have

alleged facts that, if proven, could establish a claim for strict liability under Montana law. The operative statute provides that "a manufacturer, wholesaler, or retailer" "who sells a product in a defective condition unreasonably dangerous to a user or consumer . . . is liable for physical harm caused by the product to the ultimate user or consumer . . . ." Mont. Code Ann. § 27–1–719.

The crux of the issue is causation. Remington does not claim that the Teagues have not plausibly alleged the existence of a design defect in Mark's rifle. Instead, Remington dismisses those allegations as irrelevant, contending that the Complaint "fails to include 'well-pleaded allegations' to support incident causation under Montana strict liability law—namely that Mark's rifle fired without a trigger pull because of a defect rather than simply because the trigger was pulled by decedent." (Doc. 4 at 6–7.) Remington argues that the allegations of the Complaint are too vague and/or conclusory to give rise to a plausible finding that the alleged design defect in the Walker Fire Control caused Mark's death.

It is true, as Remington argues, that the Teagues did not directly state, in a single sentence, that Mark's rifle fired without a trigger pull. But the omission is not fatal, and the Court will not elevate form over substance to grant Remington's motion. The Teagues alleged that: (1) suicide was unlikely, given Mark's mental health and the circumstances of his death; (2) Mark knew how to handle a gun safely; and (3) a design defect rendered Mark's rifle liable to fire while it was

-8-

being unloaded, even without a trigger pull. What is more, the Teagues specifically alleged that Remington "caused Mark Teague's Model 700 to fire inadvertently[,] . . . result[ing] in him suffering severe injuries, leading to his death." (Doc. 1 at 30.) Even assuming that there are gaps in the Teagues's allegations, "common sense" is all that is needed to fill them in. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

If, as Remington argues in a footnote in its reply brief, Mark's gun was not, in fact, defective, then Remington will be able to defeat a finding of liability at trial, if not at summary judgment. (Doc. 16 at 5–6 n.1.) Similarly, if Mark committed suicide, as Remington suggests in a separate footnote, there will be no liability. (Doc. 4 at 7 n.2.) But the Court cannot grant Remington's motion on either basis without invading the province of the jury. If the allegations of the Complaint are true, a reasonable jury could find for the Teagues. The Rule 12(b)(6) plausibility standard is met.

Accordingly, IT IS ORDERED that Defendants' motion (Doc. 3) is DENIED.

DATED this 11th day of April, 2019.

Dana L. Christensen, Chief Judge
United States District Court