William A. Rossbach
ROSSBACH LAW, P.C.
401 North Washington Street
P. O. Box 8988, Hellgate Station
Missoula, MT 59807-8988
Telephone:   (406) 543-5156
Fax:   (406) 728-8878
bill@rossbachlaw.com

Richard A. Ramler
Jorden S. Ramler
Ramler Law Office, P.C.
202 West Madison Ave.
Belgrade, MT  59714
Telephone:  (406) 388-0150
Fax:   (406) 388-6842
rramler@ramlerlaw.com
jramler@ramlerlaw.com
*Attorneys for Plaintiffs*

Syd McKenna
Justin Starin
McKenna & Starin, PLLC
815 E. Front Street, #4A
Missoula, MT 59802
Telephone: (406) 327-0800
Fax: (406) 327-8706
syd@mslawmt.com
justin@mslawmt.com

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

_____

| | |
|---|---|
| SHARON TEAGUE and RANDALL TEAGUE, Individually, and in their official capacity as Co-Personal Representatives of the ESTATE OF MARK RANDALL TEAGUE,<br><br>Plaintiffs,<br><br>v.<br><br>REMINGTON ARMS COMPANY, LLC; REMINGTON OUTDOOR COMPANY, INC.; SPORTING GOODS PROPERTIES, INC.; E.I. DU PONT DE NEMOURS & COMPANY;<br><br>DOES A to K, | CV 18-184-M-DLC<br><br><br><br>**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION TO COMPEL DISCOVERY** |

Defendants.

**TABLE OF CONTENTS**

I.    INTRODUCTION……………………………………………..5

II.   FACTUAL BACKGROUND………………………………….7

III.  ARGUMENT………………………………………………16

    a. Defendants Have Violated the Express Requirements of Rule
       26 And Rule 34 with Boilerplate Objections, Incomplete
       Responses, and Failure to Identify Documents Withheld……16

    b. Discovery Regarding the Walker Fire Control Documents
       Collected Pursuant to the "Suspension Order" and Not
       Previously Produced is Allowed Under the Rules…………….22

    c. Plaintiffs Have Good Reason To Believe Defense Has Not
       Produced All "Suspension Order" Documents In Prior
       Litigation……………………………………………...24
        i.  Missing Conclusion of the Study to Analyze the Safety of
            the Walker Fire Control Must Be Produced……………24

        ii. Missing Product Safety Subcommittee Meeting Minutes
            Must Be Produced……………………………………...27

        iii. Missing Gallery Test Failure Investigation and Inspection
             Records Must Be Produced…………………………28

IV.   CONCLUSION…………………………………………..30

# TABLE OF AUTHORITIES

**Cases**

*Aleksich v. Remington Arms Co., Inc.*, U.S. Dist. Ct., No. 2:91-cv-00005-BU-RFC (D. Mont. 1991)……………………………………………………passim

*Athridge v. Aetna Cas. & Sur. Co.*, 184 F.R.D. 181 (D. D.C. 1998)……………..20

*Bledsoe v. Remington*, 109 CV-69 (M.D Ga.)……………………………………..8

*Brandenburger v. Toyota Motor Sales, U.S.A., Inc.*, 162 Mont. 506, 513 P.2d 268 (1973)………………………………………………………………………..19

*Burlington Northern & Santa Fe Rwy. Co. v. United States Dist. Ct. for the District of Montana*, 408 F.3d 1142 (9th Cir. 2005)……..…………………………….22

*Castleberry v. Remington Arms Co.*, Case No. C-85-357 (S.D. Tex.)…………..31

*Chapa v. Garcia*, 848 S.W.2d 667 (Tex. 1992)…………………………………...31

*Collins v Remington,* Case No. 91-11-10856-CV (Tex. Dist.)……………………..8

*Contreras v. Remington*, CV-17-75-BLG-SPW (D. Mont.)……………………..11

*Craig v. Remington*, Case No. 87C2042 (23rd Jud. Dist., Brazoria Co., Texas)….31

*Garza v. Sporting Good Properties et al.*, 1996 WL 56247 (W.D. Tex. 1996)………………………………………………………………………..10,11,12

*Hartman v. Remington Arms, Co.*, 143 F.R.D. 673 (D. Mo. 1992)……………….31

*Lewy v. Remington Arms Co.,* 836 F.2d 1104 (8th Cir. 1988)…………………….31

*Loitz v. Remington Arms Co.*, 138 Ill. 2d 404 (Ill. 1990)………………………….31

*Luna v. Remington,* No. 28,730 (D.Ct. Jim Wells County)……………………….9

*Moore v. Remington*, Case No. A-85-CA-549 (W.D. Texas)………………………31

*Munoz v. Remington*, Case No. 7417 (100th Jud. Dist., Childress Co., Texas)…...31

*Muzyka v. Remington Arms Co.*, 774 F.2d 1309 (5th Cir. Tex. 1985)…………….31

*Nei v. Travelers Home & Marine Ins. Co.*, 326 F.R.D. 652 (D. Mont. 2018)……………………………………………………………………18,19,21,22

*Network Tallahassee, Inc. v. Embarq*, 2010 WL 4569897 (N.D. Fla. 2010)……..20

*Nigro v. Remington Arms Co.*, 432 Pa. Super. 60 (Pa. Super. Ct. 1993)………….31

*Remington Arms Co. v. Canales*, 837 S.W.2d 624 (Tex. 1992)…………………..31

*Remington Arms Co., v. Caldwell*, 850 S.W.2d 167 (Tex. 1993)…………………31

*Richardson v. State*, 2006 MT 43, 331 Mont. 231, 130 P.3d 634………………...17

*See v. Remington*, Case No. 81-886 (Dist. Oregon)………………………………31

*Seyfarth v. Remington*, Case No. 83-:-17606 (Cir. Ct. Cook County, IL)………..31

*Smith v. Gorilla, Inc.*, 2010 U.S. Dist. LEXIS 112299 (D. Mont. 2010)………...23

*Thomsen v. Remington*, Action # 10718 (Super. Ct., Co. of Calaveras, Cal.) ……31

**Statutes/Rules**

Fed. R. Civ. P. 26………………………………………………………passim

Fed. R. Civ. P. 26(b)(1)…………………………………………………..18,19

Fed. R. Civ. P. 26(b)(3)(A)……………………………………………………22
Fed. R. Civ. P. 34……………………………………………………passim
Fed. R. Civ. P. 34(b)(2)(B)……………………………………………………19
Fed. R. Civ. P. 34(b)(2)(C)……………………………………………………passim
L.R. 26.3(c)(2)……………………………………………………………………..7

**Other Authorities**
2015 Notes of Advisory Committee……………………………………………17
Steven S. Gensler, *Federal Rules of Civil Procedure: Rules and Commentary*, vol.
1 (West 2012)…………………………………………………………………..20

## EXHIBIT LIST

1. Ramler Letter dated April 14, 2020……………………………………7,11
2. Ramler Letter dated April 23, 2020……………………………………7
3. Carlson Letter dated April 28, 2020……………………………………7
4. Defendants' Responses and Objections to Plaintiffs' First Requests for
   Production……………………………………………………………………7
5. Defendants' Responses to Plaintiffs' Second Discovery Requests..7,16,26,30
6. Defendants' Responses to Plaintiffs' Third Discovery Requests…….7,28,30
7. Excerpts of Robert Haskin Deposition………………………………..8,10,11
8. Suspension Order………………………………………………………8,9
9. Declaration of Jon D. Robinson………..…………………………………11,12
10. Plaintiffs' Brief in Support of Motion for Sanctions March 23, 1995…….13
11. Memorandum and Order Dec. 22, 1995…………………………………...14
12. Plaintiff's Counsel's Response Nov. 9, 1995……………………………..15
13. Transcript of Proceedings March 28, 1995……………………………… 15
14. Product Safety Meeting – 4/23/75………………………………………...24,25
15. Product Safety Meeting – 4/28/75………………………………………….24
16. Bolt Action Rifle Safeties – 5/20/75……………………………………….25
17. Progress Report – 11/11/75……………………………………………..25
18. Progress Report – 12/1/75………………………………………………26
19. Product Safety Subcommittee Meeting – 10/23/78………………………..27
20. Product Safety Subcommittee Meeting – 1/2/79…………………………..27
21. Gallery Test Data Summary 1974 – 1991………………………………...28,29
22. Excerpts of G.J. Hill Deposition………………………………………29,30
23. Log of Safety Problems……………………………………………………29
24. Email from Ken Soucy………………………………………………………30

COMES NOW, the Plaintiffs' and submit the following brief in support of their motion to compel Defendants to answer written discovery in accordance with the Rules.

## I.   INTRODUCTION

Remington designed, manufactured, tested, and sold millions of firearms with the Walker fire control trigger mechanism.  Because firearms are heirlooms, most of them are in use today.  Plaintiffs allege Remington is strictly liable in tort because it sold these rifles in a defective condition.  The defect centers on a part Remington calls the "trigger connector."  The trigger connector, which is unique to Remington, is not attached to the trigger body and is supposed to be held in place by a small spring.  The connector separates from the trigger every time the rifle is fired.  Normal debris will get between the connector and trigger and cause the rifle to fire unexpectedly without a trigger pull.  Plaintiffs' expert will testify the Walker fire control in the rifle in this case has both manufacturing and design defects that caused the rifle to fire without a trigger pull.  Plaintiffs allege Remington's Model 700 rifle with the Walker fire control discharged a bullet without a trigger pull and killed Mark Teague.  Plaintiffs further allege the jury should impose punitive damages because Remington acted with actual malice in selling millions of rifles, including the rifle in this case, knowing the Walker fire control created a high probability of injury to its users and innocent bystanders.

Remington knowingly manufactured and sold approximately 5 million Model 700 rifles with the defective Walker fire control.

Plaintiffs have focused and limited their discovery requests to discover specific relevant information and documents that have not been produced by Defendants in prior Walker fire control litigation.  In particular, Plaintiffs are requesting Walker fire control documents that were gathered by Remington employees in response to a "Suspension Order" that have not been produced in prior litigation.  The "Suspension Order" is discussed below.

Plaintiffs are also requesting a list or log of documents produced in response to the "Suspension Order" so Plaintiffs can verify that all the documents have been produced in either this case or prior litigation.  Plaintiffs' have good cause to believe that important documents in response to the "Suspension Order" have not been produced in prior litigation.  The missing documents coupled with Defendants' long history of discovery abuse justifies the production of the Walker fire control document log.

Counsel met and conferred on February 7, 2020 regarding Plaintiffs' first discovery requests.  Without agreeing to objections, Plaintiffs narrowed the scope of their discovery requests and served Plaintiffs' second and third discovery requests.  Remington failed to answer or properly object to Plaintiffs' discovery requests.  Plaintiffs' counsel sent a letter to Defense counsel on April 14, 2020,

explaining the justification for the discovery requests and the issues that needed to be resolved.  Exhibit 1, Ramler Letter dated April 14, 2020.  Counsel conferred to try to resolve the discovery issues on April 22, 2020.  Counsel are at an impasse on some issues which is the reason for Plaintiffs' motion to compel.  Exhibit 2, Ramler Letter dated April 23, 2020, and Exhibit 3, Carlson Letter dated April 28, 2020.  Defendants remain resolute that they need not produce the requested documents in RFP 88-101, answer INT 1-4, or respond to RFA 2-8, without objection, and refuse to identify documents that they are withholding based upon their objections as required by Fed. R. Civ. P. 34(b)(2)(c).  Accordingly, the Plaintiffs request that this Court order Remington to produce documents, answer and respond to Plaintiffs' discovery requests in accordance to the Rules.

As required by L.R. 26.3(c)(2), Defendants Responses to Plaintiffs' First, Second and Third Discovery Requests, which include Plaintiffs' requests, are attached as Exhibits 4, 5, and 6.

## II.    FACTUAL BACKGROUND

In 1994 Robert Haskin, an experienced product liability defense lawyer and partner at Snell and Wilmer[1], became General Counsel and Vice President of

---

[1] According to its website, Snell and Wilmer has 450 lawyers in 15 offices and has an extensive product liability defense practice including automotive, construction, pharmaceutical and firearms products.

Remington.  Exhibit 7, Excerpts of Haskin Deposition, March 4, 2010 (*Bledsoe v.*

*Remington*, 109 CV-69, (M.D. Ga.) at 21 - 32.  Within a week of Haskin taking

that position, a Texas jury found that the Remington Model 700 rifle was defective

and rendered a 17 million dollar verdict against Remington in *Collins v Remington,*

Case No. 91-11-10856-CV (Tex. Dist.) for injuries and punitive damages.  Exhibit

7 at 37.

Shortly thereafter, on June 17, 1994, Haskin, as an experienced product

liability defense lawyer, ordered a comprehensive document sweep.  Exhibit 8,

Suspension Order.  Haskin's "Suspension Order" expressly required:

> In conjunction with pending and anticipated litigation, your assistance
> is requested in locating all existing documents and other firearm
> material as identified below.
>
> Firearm models involved: *M 700 BAR*[2], M870 pump action shotgun,
> M1100 semi auto shotgun, M11-87 semi auto shotgun. Specifically
> include all documents pertaining to *NBAR*, NCS, barrel
> improvement/modification and *fire control improvement/modification*
> *programs*. Notes: materials requested are not limited to prototype and
> production level firearms.
>
> Firearm characteristics, systems, and components involved:
> *inadvertent discharge, fire control*, barrels, and receivers. (emphasis
> added)
>
> Haskin's Order could not have been more specific about his intentions.

There was to be "no limitation on the types of documents to be included" and "all

---

[2] M700BAR stands for Model 700 Bolt Action Rifle. NBAR stands for New Bolt
Action Rifle, a program to design a safer alternative trigger for the Model 700.

forms of information must be considered." *Id.*  "No [identified] documents are to be discarded or destroyed for any reason." *Id.*

The terms we have highlighted in the Suspension Order all refer to documents pertaining to Remington's knowledge about inadvertent firing of the Model 700 and problems with the Walker "fire control."  The documents to be collected were all documents in existence, prepared in the normal course of business by Remington and DuPont employees or agents, not likely by lawyers as work product or privileged.

The Order was not just a directive to Remington employees to gather Model 700 Walker fire control documents, it was also a directive to gather documents relevant to shotgun barrel burst litigation.  The two areas of litigation do not have anything in common.  Remington faced Walker fire control litigation beginning in the early 1970's and shotgun barrel burst litigation from the 1980's through the 1990's.

 Attorney John Shaw of Brian, Cave, McPheeters & McRoberts, Kansas City, Missouri, represented Remington in Walker fire control litigation prior to and at the time of the "Suspension Order" document sweep.  Attorney Lee Ware of Ware, Snow, Fogel, Jackson & Green, P.C., Houston, Texas, represented Remington in a Walker fire control class action pending at the time of the document sweep, *Luna v. Remington.*

Dale Wills represented Remington in shotgun barrel burst litigation in the 1980's through the time of the "Suspension Order" document sweep.  The law firm of Snell and Wilmer represented Remington in a shotgun barrel burst class action pending at the time of the document sweep, *Garza v. Sporting Good Properties et al.*, 1996 WL 56247 (W.D. Tex. 1996).

In deposition, Haskin explained that as General Counsel and Vice President he had to ensure that all documents relevant to litigation were collected and preserved:

> A.     My recollection is that fairly shortly after coming to Remington and beginning to address complex litigation issues that we were facing, *I felt it was necessary to make sure that nothing was being destroyed under some DuPont document retention policy, that we, you know, put a stop order in place so that every single document that existed within that organization was retained for future use in that litigation.*
>
> Q.     Whether it be favorable to Remington or otherwise?
>
> A.     Whatever it was, it needed to be retained.

Haskin Depo., Exhibit 7 at 97. (emphasis added)

Defense counsel have represented that the shotgun barrel burst documents gathered in response to the Suspension Order went Snell & Wilmer.  Defense counsel has represented that the Model 700 Walker fire control documents did <u>not</u> go to Snell and Wilmer, but they have refused to disclose where the Walker fire control documents went, who reviewed them, where they are currently located, and

if no longer in existence, why they are no longer in existence for spoliation. Exhibit 1, Page 5.

Snell and Wilmer prepared a document log of the shotgun barrel burst documents.  Haskin testified that he ordered production of a log and that Snell and Wilmer logged the documents to a computer. Exhibit 7 at 97 - 106.  As noted above, Snell and Wilmer represented Remington in the *Garza* shotgun barrel burst class action.

Defendants have refused to disclose who prepared a log of the Walker fire control documents.  It would seem likely that either John Shaw or Lee Ware logged the Walker fire control documents because they represented Remington in Walker fire control litigation at that time.

Sometime in late 1994, Jon Robinson, a lawyer who had litigated numerous shotgun barrel burst cases and was lead counsel in the *Garza* shotgun barrel burst class action reviewed the shotgun barrel burst documents at Snell and Wilmer. Robinson described his review of the collected documents in a declaration for an anticipated motion to compel in *Contreras v. Remington*, CV-17-75-BLG-SPW (D. Mont.) Exhibit 9, Declaration of Jon D. Robinson.

Robinson declared that in late 1994 counsel for Remington told him that there were "newly discovered documents that [he] might want to review" that were

located at the Snell and Wilmer law firm in Phoenix.  *Id.* Para.6.  In January and February 1995, Robinson spent 13 days reviewing approximately 100 banker's boxes of documents at Snell and Wilmer.  *Id.* Para. 7.  Even though his focus was shotgun barrel burst documents, he also found "numerous documents related to Remington Model 700 Rifles and Walker fire controls."  *Id.* Para.9.  Robinson was not involved in Walker fire control litigation and was not looking for Walker fire control documents.  What Robinson did find was a 13-page report on testing and evaluation of shotgun barrels by Remington and DuPont in 1980 that was "essentially identical to conclusions regarding defect and causation reach (sic) by the expert I had retained for prior shotgun barrel burst cases."  *Id.* Para. 11.  As a result of finding the 13-page document, *Garza* was settled and Remington recalled the defective shotgun barrels at a cost to Defendants of approximately 30 million dollars.  Robinson declared that "My discovery of these documents, from 1980, provided (sic) that Remington committed discovery abuse in every case from 1980 through 1995 because it failed to produce these adverse reports in the numerous cases I pursued during the period from 1980 to 1995."  *Id.* Para. 13.

While Defendants have refused to disclose where the Walker fire control documents went for review and logging after the document sweep, at least some of the documents went to John Shaw who was representing Remington in federal court in Butte, Montana.  Bob Carlson was local counsel in the case.  On October

29, 1991 U.S. District Judge Paul Hatfield issued an Order to Compel to Remington in *Aleksich v. Remington,* CV-91-005-BU (D. Mont.).  On February 7, 1995, at the same time as Jon Robinson was reviewing shotgun barrel burst documents at Snell and Wilmer, John Shaw, Remington's outside counsel handling Walker fire control litigation, told Richard Miller, Plaintiffs' counsel in *Aleksich* that there were eight (8) to twelve (12) banker's boxes of "newly discovered" documents "he might want to see." Exhibit 10, Plaintiffs' Brief in Support of Motion for Sanctions March 23, 1995 at 4.  Shaw's offer was more than 3 years after Hatfield's Order and less than a month before the *Aleksich* trial.  *Id.* at 2.  On March 3, 1995, instead of 8-12 boxes, Shaw produced only four (4) boxes of documents.  *Id.* at 4.  Plaintiffs' counsel filed a motion for sanctions on March 22, 1995.  Miller represented to the Court that "the probative value of the untimely production exceeds the cumulative value of all of the documents Plaintiffs' counsel has obtained over the past decade in well over a dozen similar cases…" *Id.* at 7. Judge Hatfield held a hearing on the sanctions motion on March 27, 1995 that was not transcribed.  However, a second hearing the next day was transcribed.  At that hearing, Defendants' counsel announced to the Court that the case had been settled, that the settlement was confidential and, further, that the entire court file had to be sealed.

The entire *Aleksich* court file was sealed until 2012 when U.S. District Judge Richard F. Cebull granted a motion to intervene and a subsequent motion to unseal by Richard Barber.  Barber's son Gus was killed by a Model 700 that fired without a trigger pull when his wife released the safety.

Although the details of Judge Hatfield's threatened sanctions against Remington on March 27 were not transcribed, his Memorandum and Order of December 22, 1995, Exhibit 11, provides strong indication of how serious they might be. Discussing the Plaintiffs' sanctions motion, the Court described its intention regarding sanctions:

> … the court's anticipated disposition of the motion for sanctions, and specifically, *the burden which the court intended to impose upon the defendants relative to the motion.*  Exhibit 11, Memorandum and Order at 4. (emphasis added)

Additional evidence from the *Aleksich* file of the Court's intentions come from other unsealed pleadings. In responding to Defendants' attempts to sanction Miller for alleged improper disclosures of the "newly discovered" documents, Miller wrote:

> Defendants settled the instant case under threat of sanctions for failure to timely produce documents only after this Court advised them of the investigation it intended to conduct. The Defendants' overriding settlement goal was to prevent that transcript and other comments by the Court and counsel in Montana from being used against them in other Remington bolt action rifle cases. Defendants knew they had

> defrauded literally dozens of other Plaintiffs by denying them important evidence that existed long before their unfortunate experience with a Remington bolt action rifle.

Exhibit 12, Plaintiffs' Counsel's Response Nov. 9, 1995 at 3.

The Court's off the record discussions with counsel on May 27, 1995 thus undeniably played a role in Defendants' decision the next day to settle the case in return for withdrawal of the sanctions motion and an unprecedented request to seal the entire record of the case. The unsealed transcript of the May 28, 1995 hearing provides a confession by Defendants' counsel of the measures Defendants went to keep Judge Hatfield's proposed burdensome sanctions for delayed and non-disclosure of its Walker Fire Control documents secret from every other court that might have, or had, a similar case:

> Mr. Carlson: *Just to explain, your Honor, what we do not want to have happen in another case somewhere else, a discussion about what a court in Montana was to do about a specific issue*.

Exhibit 13, Transcript of Proceeding March 28, 1995 at 47. (emphasis added)

Defendants refuse to explain what happened to the boxes of Walker fire control documents that were not produced in *Aleksich*. RFP 95. Defendants also refuse to explain who reviewed and logged the Walker fire control documents gathered in response to the Suspension Order, INT 1, 2, and 3, and RFP 89.

Defendants have also refused to identify the documents they are withholding based upon their objections.  RFP 88.

Bob Carlson represented Defendants in *Aleksich*.   Dale Wills began representing Defendants in Walker fire control litigation shortly after *Aleksich* was settled and has continued to do so through today.  It should not be difficult for Defendants to respond to the discovery requests.

## III.   ARGUMENT

### a.   Defendants Have Violated the Express Requirements of Rule 26 And Rule 34 with Boilerplate Objections, Incomplete Responses, and Failure to Identify Documents Withheld.

The Defense listed blanket objections including irrelevant, duplicative, unreasonable, not proportional, too broad, privileged confusing, and an end-run on a prior discovery agreement.  *See* Exhibit 5.  Remington's overarching objection to the discovery requests is that Plaintiffs have "access to any and all relevant and discoverable information necessary to prosecute Plaintiffs' case" from discovery in prior cases against Remington Arms Company, Inc.  *See* Exhibit 5 at 3-9.   None of these objections are valid and – most importantly -- none of the responses state whether any responsive materials are being withheld on the basis of the objection pursuant to Fed. R. Civ. P. 34(b)(2)(c).

Rule 34(b)(2)(c) requires that "An objection must state whether any responsive materials are being withheld on the basis of that objection."  Defendants

have refused to state whether any responsive materials are being withheld on the basis of their objections in clear violation of the requirements of Rule 34(b)(2)(c).

The purpose of discovery is to find the truth. *Richardson v. State*, 2006 MT 43, ¶ 22, 331 Mont. 231, 130 P.3d 634 (citations omitted). Defendants have violated both the express requirements of amended Fed.R.Civ.P 26 and 34 and the plain intent and spirit of the recent amendments to the rules, as explained in the 2015 Notes of the Advisory Committee. The 2015 Rule 26 clarifies the role of "proportionality" in discovery. As the Advisory Committee warns:

> Nor is the change intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional. 2015 Notes of Adv. Comm.

The Committee acknowledged there might be "information asymmetry" that in practice might mean that the burden lies heavier on one party. It cautioned that monetary stakes are only one factor and pointed to "the significance of the substantive issues, as measured in philosophic, social, or institutional terms." These "may have importance far beyond the monetary amount involved." 2015 Note of Adv. Comm. Notes. Here, although punitive and wrongful death damages may be substantial, public health, safety, and welfare is at stake if Remington is allowed to pick and choose which documents it considers proportional and keep full knowledge of the dangers in more than 5 million of these rifles hidden. Nothing in the Rule, the Notes, or any case says that Remington gets to decide how

17

much of its relevant documents it has to disclose.  Nothing provides that it gets to decide how much is enough. Defendants have never said that we have all the relevant documents they have.  Instead they have arrogated to themselves the right to decide what proportion of the relevant documents Plaintiffs may have.  Their position on proportionality is that they are the sole arbiter of what is enough and what is necessary for our case.  Plainly that position has no merit.

This Court has confirmed that "the (2015 FRCP) change was not intended to permit the opposing party to refuse discovery simply by making a boilerplate objection that it is not proportional.'" *Nei*, 326 F.R.D. at 656 (cite omitted). Courts should "conside[r] the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. Pro. 26(b)(1).  "'The burden lies on the objecting party to show that a discovery request is improper.  Where a party's objections are themselves vague and impermissibly overbroad, and no specifics are given, the objecting party fails to carry its burden.'" *Nei*, 326 F.R.D. at 656-657 (cite omitted).  Even cursory review of Defendants' responses show they fail each of these tests.

Federal Rule of Civil Procedure (FRCP) 26(b)(1), provides "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . ."  Relevance is broadly defined and includes information that goes to a "party's claim or defense" in a case.  Fed. R. Civ. P. 26(b)(1); *Nei v. Travelers Home & Marine Ins. Co*., 326 F.R.D. 652, 656 (D. Mont. 2018).

As this is a strict liability case, substantive Montana law does not follow a "a strict rule of direct evidence" in strict liability cases but provides that circumstantial evidence of liability is enough.  *Brandenburger v. Toyota Motor Sales, U.S.A., Inc.*, 162 Mont. 506, 517, 513 P.2d 268, 275 (1973).  The policy behind strict liability in products law is to protect the consuming public from "dangerous defects in manufactured products by requiring the manufacturer to bear the burden of injuries and losses enhanced by such defects in its products."  *Id.*

Rule 34(b)(2)(B) was also amended in 2015 to require that for each item or category of items requested, "the response must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." Fed. R. Civ. P.R. 34(b)(2)(B). As the Advisory Committee Notes to Fed. R. Civ. P. 34 make clear "This provision . . . eliminat[es] any doubt that less specific objections might be suitable under Rule 34." Like Rule 26, the amendment to Rule 34(b)(2)(B) thus clarifies that

general or boilerplate objection are improper and should result in a waiver of the

unsupported objections.

Professor Steven Gensler was the Reporter for the rules committee

amending the discovery rules in 2015.  He concludes that "Generalized objections

that discovery requests are vague, overly broad, or unduly burdensome generally

are insufficient and will be overruled." Gensler, *Federal Rules of Civil Procedure:*

*Rules and Commentary*, vol. 1, 535 (West 2012).

Responses similar to "objection in part" or "with respect to the limited

portion . . . to which there is no objection" are not legitimate.  In *Athridge v. Aetna*

*Cas. & Sur. Co.*, the Court held:

> This type of answer hides the ball. It leaves the plaintiff wondering
> what documents are being produced and what documents are being
> withheld. *Furthermore, it permits the defendant to be the sole arbiter*
> *of that decision*. Such an objection is really no objection at all as it
> does not address why potentially responsive documents are being
> withheld. The defendant, having no incentive to err on the side of
> disclosure, *has arrogated to itself the authority to decide the question*
> *of relevance* which is unquestionably the decision of the
> judge.  (emphasis added.

184 F.R.D. 181, 190 (1998). *Accord Network Tallahassee, Inc. v. Embarq,* 2010

WL 4569897, 1 (N.D. Fla. Sept. 20, 2010)("This is an abusive practice…)

Defendants have ignored the requirements of both FRCP 26 and 34. For

nearly every discovery request, they have listed numerous boilerplate generalized

objections, have not stated whether they are withholding materials because of those

objections, and have made no showing that carries their burden that the discovery should not be allowed.

No prior agreement limits the discovery requests.  As noted above, Jon Robinson saw some Walker fire control documents during his review of the shotgun barrel burst documents at Snell and Wilmer.  Some Walker fire control documents were included in the shotgun barrel documents for an unknown reason. In reliance on Robinson's declaration, Plaintiffs requested and Defendants agreed to review the shotgun barrel burst documents and produce any Walker fire control documents that they found.  Defendants subsequently produced approximately 12,000 pages of Walker fire control documents that had been included in the shotgun barrel burst documents.  To the best of Plaintiffs counsel's knowledge, some of the Walker fire control documents had never been produced in prior litigation.  The parties agreement concerning the review of the barrel burst documents did not in any way limit or prevent other discovery in this action.

No privilege protects disclosure of the requested discovery.  "A federal court sitting in diversity applies the privilege law of the forum state. . . and applies federal law in determining the application of the work product doctrine." *Nei*, 326 F.R.D. at 657 (cites omitted).  "Under Montana law, privilege is construed narrowly. . ." *Nei*, 326 F.R.D. at 658 (cite omitted).  To claim attorney/client privilege "documents must contain confidential communications for the purpose of

seeking legal advice.'" *Nei*, 326 F.R.D. at 658 (cite omitted). "To be protected

under the work product doctrine, the document must be 'prepared in anticipation of

litigation.'" *Nei*, 326 F.R.D. at 658 (citing Fed. R. Civ. P. 26(b)(3)(A)). "This

does not include documents prepared in the ordinary course of business. . .and the

party withholding the documents has the burden to show that each document

withheld 'was prepared or obtained because of the prospect of litigation.'" *Nei*,

326 F.R.D. at 658 (cites omitted). Nothing in the Suspension Order provides any

basis for a claim that the collected documents are privileged or work product. On

its face the Suspension Order demands collection of documents produced in the

ordinary course of Defendants' business. Defendants have not shown how any of

these documents were prepared in anticipation of litigation and have not produced

a privilege log even if they were. Failing to do so timely as required by Rule 34

waives any belated claim now. *See*, *Burlington Northern & Santa Fe Rwy. Co. v.*

*United States Dist. Ct. for the District of Montana*, 408 F.3d 1142, 1150 (9th Cir.

2005) (affirming District Court opinion that untimely privilege log waived

privilege claim).

> **b. Discovery Regarding the Walker Fire Control Documents**
> **Collected Pursuant to the "Suspension Order" and Not Previously**
> **Produced is Allowed Under the Rules.**

Plaintiffs'' Interrogatories 1-4, RFP 88, 89, 90, 91, 95, and RFA 4-8 all

include requests or admissions that concern Walker fire control documents

gathered in response to the "Suspension Order."  Defendants objected with more boilerplate objections, including irrelevant, duplicative, unreasonable, confusing, overly broad, not proportional, burdensome, not tailored, privileged, plaintiff has many records already, and an end-run on a prior discovery agreement.  *See* Exhibits 5-6.  Defendants failed to carry its burden of showing its objections are valid, *Smith v. Gorilla, Inc.*, 2010 U.S. Dist. LEXIS 112299, *3-4 (D. Mont. 2010), and none of the responses state whether any responsive materials are being withheld on the basis of the objection, in violation of Rule 34(b)(2)(c).

Defendants' proportionality objection is without merit.  The Court may take judicial notice that every organization such as Remington and DuPont that produces documents in litigation maintains a log.  Regarding the log of Walker fire control documents collected here, every document ever produced in every Model 700 case has a Bates number place there by Remington to keep track of what it is disclosing.  It is obvious that Defendants have a repository of these documents from years and hundreds of cases and should know well what they collected pursuant to the Suspension Order and so the cost of producing the log of the collected documents would be minimal.

Further, because a log of the Walker fire control documents must exist, there should not be much extra work by the defense in producing or specifically identifying documents it is withholding based upon specific objection.  Remington

had a duty to preserve these documents and these documents thus should be stored in an orderly fashion and readily identifiable.

### c.   Plaintiffs Have Good Reason To Believe Defense Has Not Produced All "Suspension Order" Documents In Prior Litigation.

Plaintiffs' requests are not based in speculation.  As discussed in detail below, Plaintiffs point to specific examples of missing records from prior production as basis that not all records collected in the "Suspension Order" have been produced.

### i.   Missing Conclusion of the Study to Analyze the Safety of the Walker Fire Control Must Be Produced.

Plaintiffs'' RFP 98 and 99 request documents related to a study conducted by Remington to determine whether the Walker fire control was safe.  The findings and conclusions of the study and information gathered during the study have never been produced and should have been included in the Walker fire control documents gathered in response to the Suspension Order.

Remington had a Product Safety Subcommittee that investigated product deficiencies.  The Product Safety Subcommittee initiated a study to analyze the safety of the Walker fire control on April 23, 1975. Exhibit 14, Product Safety Meeting-4/23/75. The purpose of the study was "to make a comprehensive review of the fire controls used in . . . bolt action rifles."  Exhibit 15, Product Safety Meeting-4/28/75.  The study directed participation by all of the major departments

of Remington, research, marketing and production.  The research department was
instructed to "Review present design; Failure analysis; Identify tolerance build-up
problems, if any; Determine critical design specifications."  Exhibit 14.  The
marketing department was instructed to "Review reports from the field," and other
assignments.  *Id.*

Documents that Defendants have produced in prior litigation demonstrate
compelling reason to believe Remington concluded the Walker fire control was not
safe and the primary reason was the connector.  On May 20, 1975, one month after
the study was initiated, a memo from the marketing department states three areas
had been searched for information: 1) The Computer, 2) All available Gunsmith
Call Reports, and 3) Arms Service Usage Report."  "The Computer Report is
broken down into three (3) parts:  1) Safety malfunctions found in our gallery on
new rifles, 2) The number of complaints coming into Arms Service, and 3) The
number of actual justified complaints from number 2, preceding."  Exhibit 16, Bolt
Action Rifle Safeties-5/20/75.  On November 11, 1975, six months later, a
Progress Report states "M/700 Fire Control – Has been tested and evaluation is
forthcoming."  Exhibit 17, Progress Report-11/11/75.

On December 1, 1975, three weeks later, a Progress Report states "M/700
Trigger (One Piece) - For test purpose only, a trigger was made by screwing a
connector to a M/700 trigger making in effect, a sold one piece trigger.

Preliminary tests indicate a one piece trigger may be acceptable."  Exhibit 18, Progress Report 12/1/75.

A one-piece trigger made by screwing the connector to the trigger body functionally eliminates the connector which is the primary design defect alleged in the Walker fire control.  Eliminating the connector eliminates the occurrence of debris and other foreign matter accumulating between the connector and trigger which can cause the rifle to fire without a trigger pull. The findings of the study and the information gathered and reviewed in the study likely existed when "Suspension Order" documents were gathered but have not been produced in prior litigation.

As further evidence that the study concluded the trigger connector needed to be eliminated, other documents that have been produced in prior litigation establish that Remington worked on a number of different fire controls to replace the Walker fire control from December, 1975 until 2006.   In 2006, Remington introduced the X Mark Pro, or XMP, which replaced the Walker fire control.  Every fire control design Remington worked to develop after December 1975 had no connector.

Defendants' boilerplate objections state the requests are duplicative, overly broad, and Plaintiffs already possess responsive and relevant documents in prior litigation.  *See* Exhibit 5.  None of these objections are supported and none of the

responses state whether any responsive materials are being withheld on the basis of the objection pursuant to Rule 34(b)(2)(c).

### ii. Missing Product Safety Subcommittee Meeting Minutes Must Be Produced.

Another example of requested but missing and/or undisclosed records are Remington's Product Safety Subcommittee meeting minutes.  The Product Safety Subcommittee was established to investigate product deficiencies.  Remington has not produced approximately three years of minutes from Product Safety Subcommittee meetings from December 5, 1975 to October 23, 1978.  The three-year gap starts five days after Remington reported on the "One Piece" M/700 trigger. Exhibit 18. The first meeting minutes after the three-year gap, contain the Product Safety Subcommittee's recommendation to recall the Model 600 bolt action rifle.  Exhibit 19, Product Safety Subcommittee Meeting-10/23/78.  In January 1979, three months after the gap, the Product Safety Subcommittee decided not to recall the Model 700 even though it acknowledged at least some Model 700 rifles in the field were known to fail safety tests and could fire without a trigger pull.  Exhibit 20, Product Safety Subcommittee Meeting-1/2/79.  During the three-year gap, Remington worked on replacement fire controls for the Model 700, all of which eliminated the connector. The missing meeting minutes would have been gathered in response to the "Suspension Order" but have never been

produced.   Defense needs to produce these missing records or admit without objection to RFP 7.  *See* Exhibit 6.

### iii.   Missing Gallery Test Failure Investigation and Inspection Records Must Be Produced.

Another example of missing records are gallery test failure records. Remington performs "gallery" testing in its factory on all new rifles.  Gallery testing includes the functioning and firing of each rifle in the factory before it is sold.  Plaintiffs' RFP 92, 93, 94, 96, 97, 100, and 101 and RFA 2 and 3 request documents and admissions related to the cause of Walker fire control malfunctions in gallery testing and the final audit in Remington's factory of brand new guns.

To focus and make clear what was requested, RFP No. 92 referenced and attached a document entitled "Log of Safety Problems," and requested production of similar documents regarding gallery testing.  RFP 93 likewise attached a document to help focus the request.  Plainitffs' RFP No. 94 further requests documents related to the inspection or investigation of all malfunctions of a Walker fire control during gallery testing, final test or final audit.

We know from documents produced in prior litigation that there were hundreds Walker fire control failures in gallery testing.  For example, from 1974 to 1991, 125 Model 700 rifles fired without a trigger pull on safety release (FSR) in gallery testing.  Exhibit 21, Gallery Test Data Summary 1974-1991.  Three hundred seventy-five, (375) Model 700 rifles inadvertently fired during follow

down (FD), 447 failed to connect (FC) and 486 discharged with a light blow (LB).
*Id.*

According to a Remington Quality Control supervisor, Remington

investigated the cause of every gallery test safety malfunction and documented the

findings of the investigations.  G.J. Hill was the supervisor of the Quality Control

Department from 1974 through 1977.  Exhibit 22, Excerpts of G.J. Hill Deposition

[*Thompson v. Messer,* 1983].  Hill was responsible for gallery testing of finished

rifles in the factory.  *Id.* at 30.  Hill's job included auditing and testing of the

M/700 and M/600.  *Id.* at 30-31.  Hill testified that when a quality control auditor

detected a malfunction in the fire control of a Model 700, they would report it to

Hill and they would "find out a cause, if one existed."  *Id.* at 37- 38.  Hill testified

that the cause of the malfunction would be recorded in the "quality audit records."

*Id.* at 38-39.  The "quality audit records" would be prepared by Hill and copies

would be provided to engineering and production supervision. *Id.* at 40-41.

Defendants have not produced records disclosing the cause of gallery test

failures in any prior case, except for the one document identified in Plaintiffs' RFP

92, the "Log of Safety Problems." Exhibit 23, Log of Safety Problems.

The "Log of Safety Problems" document is the only document Remington has

produced in prior litigation describing the cause of Model 700 rifles firing without

a trigger pull in gallery testing.  Gallery test documents would provide proof of

brand new rifles failing tests before they left the factory due to metal chips and other debris lodged between the connector and trigger body causing the rifles to fire without a trigger pull.  Quality Control Supervisor Hill testified he was aware of various causes of Model 700 rifles firing without a trigger pull including foreign material in the fire control, oil, or a metal chip.  Exhibit 22 at 63-64.  Lubricant and a metal chip were found between the connector and trigger body in the rifle that killed Mark Teague.

Defendants' management knew that "in the field, any foreign object of about the same size could, and probably has, produced the same result."  Exhibit 24, Email from Ken Soucy.  The reports would have been included in the documents gathered in response to the "Suspension Order," and should be produced if they have not been destroyed.

Defense objects stating the requests are irrelevant, duplicative, overly broad, Plaintiffs already have possession of numerous gallery testing records, the subject rifle passed joint exam testing, and Plaintiffs' expert didn't disclose manufacturing defects.  *See* Exhibit 5-6.  None of these objections have merit and Defendants fail to comply with Rule 34(b)(4)(c).

## IV.   CONCLUSION

Plaintiffs have requested and must have the document logs to assure all of the Walker fire control documents gathered in response to the "Suspension Order"

have been produced.  Remington's extensive history of discovery abuse requires

that any and all logs be produced to ensure once and for all relevant documents

have been produced.  Defendants have been sanctioned for discovery abuse in the

following cases:

> *Lewy v. Remington Arms Co.*, 836 F.2d 1104, 1106-1107 (8th Cir.
> 1988)
> *Hartman v. Remington Arms Co.*, 143 F.R.D. 673 (D. Mo. 1992)
> *Remington Arms Co. v. Caldwell*, 850 S.W.2d 167 (Tex. 1993)
> *Nigro v. Remington Arms Co.*, 432 Pa. Super. 60 (Pa. Super. Ct.
> 1993)
> *Muzyka v. Remington Arms Co.*, 774 F.2d 1309 (5th Cir. Tex. 1985)
> *Chapa v. Garcia*, 848 S.W.2d 667 (Tex. 1992)
> *Remington Arms Co. v. Canales*, 837 S.W.2d 624 (Tex. 1992)
> *Thomsen v. Remington*, Action #10718 (Super. Ct., Co. of
> Calaveras, Cal.)
> *Seyfarth v. Remington*, Case No. 83-L-17606 (Cir. Ct. Cook
> County, Illinois)
> *Craig v. Remington*, Case No. 87C2042 (23rd Jud. Dist., Brazoria
> Co., Texas)
> *Munoz v. Remington*, Case No. 7417 (100th Jud. Dist., Childress
> Co., Texas)
> *Moore v. Remington*, Case No. A-85-CA-549 (W.D. Texas)
> *See v. Remington*, Case No. 81-886 (Dist. Oregon)

Remington settled cases under the threat of severe sanctions for discovery

abuse in the following cases:

> *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404 (Ill. 1990)
> *Aleksich v. Remington Arms Co.*, Case No. CV-91-050-BU-RFC
> (Mont. 1991)
> *Castleberry v. Remington Arms Co.*, Case No. C-85-357 (S.D.
> Tex.)

Defendants here have violated Rule 26 and 34 of the Rules of Civil

Procedure.  Defendants objections are without merit and most importantly

Defendants have failed to identify documents that it is withholding based upon its objections in violation of Rule 34(b)(4)(c).

Defendants have refused to state who reviewed the Walker fire control documents gathered in response to the "Suspension Order," whether they were logged, where they are currently located, and if they no longer exist, what happened to them.

Plaintiffs therefore urge to the Court to overrule Defendants impermissible objections and incomplete response and order Defendants to fully respond to the discovery requests in Plaintiffs' motion.

Dated this 7th day of May, 2020.

RAMLER LAW OFFICE, P.C.

By:    /s/ Richard A. Ramler
    Richard A. Ramler

MCKENNA & STARIN, PLLC

ROSSBACH LAW, PC

*Attorneys for Plaintiff*

## CERTIFICATION OF COMPLIANCE WITH L.R. 26.3(c)(1)

As required by L.R. 26.3(c)(1), the parties have communicated two separate times via phone conversation and detailed letter correspondence to attempt to meet and confer.

## CERTIFICATION OF COMPLIANCE WITH SCHEDULING ORDER

As required under the Scheduling Order, Counsel certifies it advised Plaintiffs that the loser will pay the opposing party's associated fees and costs.

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this brief complies with L.R. 7.1(d)(2), and that the number of words in this brief, excluding caption, certificates of service and compliance, table of contents and authorities, and exhibit index, is 6,360 words.  This is based on a word-processing system.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon the following individuals by the means designated below this 7th day of May, 2020:

[X] CM/ECF                     Clerk, U.S. District Court

[X] CM/ECF                     Robert M. Carlson
                               Corette Black Carlson & Mickelson
                               129 West Park Street
                               P.O. Box 509
                               Butte, MT 59703

[X] CM/ECF                     Dale G. Wills
                               Andrew A. Lothson
                               Swanson, Martin & Bell, LLP
                               330 North Wabash, Suite 3300

Chicago, IL 60611

   /s/ Richard A. Ramler
Richard A. Ramler