# EXHIBIT 10

Mr. John W. Whelan and
Mr. William P. Joyce
BURGESS, JOYCE & WHELAN
2801 South Montana Street
Butte, MO 59701
Telephone: 406-782-0484

Mr. William H. McDonald
Mr. Richard C. Miller
WOOLSEY, FISHER, WHITEAKER & McDONALD
P.O. Box 1245
Springfield, MO 65801
Telephone: 417-869-0581

367 FILED

'95 MAR 23 AM 9 10

LOU ALEKSICH JR. CLERK
BY _____
DEPUTY CLERK

ATTORNEYS FOR PLAINTIFFS

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

| | |
|---|---|
| LOUIS ALEKSICH, RAINELLE ALEKSICH, and BRENT ALEKSICH,<br><br>        Plaintiffs,<br><br>    vs.<br><br>REMINGTON ARMS COMPANY, INC.,<br>    and<br>E. I. DuPONT DE NEMOURS AND COMPANY,<br><br>        Defendants. | Cause No. CV-91-5-BU-PGH |

BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

    COME NOW Plaintiffs, Brent Aleksich, Louis Aleksich and Rainelle Aleksich,
by and through their attorneys of record, and file the following brief in support
of their Motion For Sanctions:

## I.    INTRODUCTION

On Friday, March 3, 1995, four (4) boxes of documents totalling Eighteen Thousand Four Hundred and Forty Three (18,443) pages were delivered to Plaintiffs' counsel's office less than a month before trial. The four (4) boxes contained literally thousands of documents responsive to discovery submitted by Plaintiffs on February 22, 1991 and ordered produced by this Court on October 29, 1991, over three (3) years ago. Hundreds of these documents are extremely relevant to and probative of Plaintiffs' claims in the instant lawsuit. The significance of this evidence can not be understated--there is more quality proof within the pages of these documents than that obtained by Plaintiffs' counsel through similar discovery in over a dozen Remington bolt action rifle cases spanning the past decade. The significance of these belatedly produced documents is not limited to trial as they would have supported a Motion For Summary Judgment on such issues as defect, negligence, and knowledge.

As a result of intensive efforts over the last two (2) weeks involving approximately one hundred (100) man hours of work, Plaintiffs have identified 368 newly produced documents as exhibits on their Supplemental Exhibit List filed with the Court last Friday, March 17, 1995. Now less than a week before trial, Plaintiffs find themselves with an incredible amount of important, new evidence but no time to digest it, much less conduct appropriate discovery of the parties or individuals involved. In addition, the time spent over the last two (2) weeks reading these documents just to find out what is in them in order to identify exhibits has seriously detracted from Plaintiffs' trial preparation. Now, when Plaintiffs' counsel should be fine tuning the case, they are still trying to understand it because Defendants, yet again, have flagrantly abused the discovery process. Not only are both Defendants subject to sanctions for their failure

2

to produce these documents for over three (3) years but their egregious conduct, past and present, calls for the maximum penalty authorized by F.R.C.P. 37--the striking of Defendants' answers and affirmative defenses and the rendering of a default judgment against them on all issues but the amount of actual and punitive damages. Defendants' failure to comply with this Court Order regarding discovery was intentional.

Defendants' further refusal to explain their transgressions, despite repeated requests over the last forty (40) days is more evidence of their willful conduct. (See Exhibit 1, Plaintiffs' correspondence). Absent any explanation, or even attempt to explain what appears to be the most egregious discovery violation in a long history of similar conduct, Plaintiffs' duty to both his clients and this Court is to file this Motion. When the facts are known, and they will be, the serious sanctions Plaintiffs' request will be just.

II.   THE RULES.

Federal Rule of Civil Procedure 37(d) states: "If a party or an officer, director or managing agent of a party...fails...(3) to serve a written response to a request for inspection permitted under Rule 34, after a proper service of the request, the Court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others, it may take any action authorized under sub-paragraphs (A), (B), and (C) of sub-division (b)(2) of this Rule." Sub-division (b)(2) of F.R.C.P. 37 authorizes three (3) specific sanctions beginning with (A)-an Order designating that facts be established in favor of the aggrieved party; next, (B) an Order refusing to allow the disobedient party to support or oppose designated claims; and, finally (C)--an Order striking pleadings, including answers and affirmative defenses, and rendering judgment by default.

3

Because of the broad scope and extreme relevance of the documents contained in Plaintiffs Supplement Exhibit List, not to mention the remainder of the four (4) boxes, these remedies are in essence one and the same.  The documents are acutely probative of issues ranging from defect and negligence in design, manufacture and sale to the cause of this accident and the Defendants' actual knowledge of the problem, over the last fifty (50) years.  As such, any order establishing certain facts related to or based upon the recently produced evidence would result in a judgment on all issues but the amount of actual and punitive damages.  That is the remedy Plaintiffs seek both by way of striking pleadings and rendering a default judgment in their favor pursuant to F.R.C.P. 37(b)(2)(C) and establishing all liability facts in their favor pursuant to F.R.C.P. 37(b)(2)(A) and (B).

III.  THE FACTS.

On March 3, 1995, less than a month before trial, Plaintiffs' counsel received four (4) bankers boxes full of documents which had never been produced before in this case nor seen the light of day in any of the dozens of other similar Remington bolt action rifle cases.  These four (4) boxes contained a total of 18,443 pages comprising some eight (8) linear feet of paper.  (attached hereto as Exhibit _2_ are photographs of each of the four (4) boxes showing their date of shipment as well as a photograph of the boxes open showing the sheer volume).  Plaintiffs' counsel had been advised in a conference with opposing counsel, John Shaw and Nick DiVita, on February 7, 1995, that approximately "eight (8) to twelve (12) boxes" of documents would be produced containing some documents that Plaintiffs "might want to see."  Other than stating that some people had retired as a result of the change in ownership, defense counsel refused to provide any information regarding the nature of the documents, where

4

the documents had been, who had possession or custody of same, why they had not been previously produced, or any other indication of the contents of these eight (8) to twelve (12) boxes.  To date, defense counsel have not explained the discrepancy in the number of boxes produced versus the number plaintiffs' counsel was told existed.  Plaintiffs have asked Defendants to provide written confirmation of whether there are other boxes, so the Court and parties know what they are dealing with. (Exhibit _1_ ).

Defense counsel proceeded to state that they could not produce the documents immediately as they needed to review them first and that would take some time.  Plaintiffs' counsel suggested February 15, 1995, as an appropriate production date.  Defense counsel stated that they would need until at least March 1, 1995.  Unaware of the significance of these documents which in retrospect had been downplayed, Plaintiffs' counsel agreed but reserved his client's rights and any further reaction until the documents were reviewed.  He also indicated that he would raise this issue with the Court at the Pre-Trial Conference scheduled the following week on February 15, 1995.

At the Pre-Trial Conference, Plaintiffs' counsel advised the Court of the existence of eight (8) to twelve (12) boxes of new documents but stated he could not discuss their contents as he had not seen them and defense counsel had not provided any further information.  Plaintiffs' counsel asked the Court to require Defendants to provide information regarding where the documents had been, who had been in possession or custody of them, and why they had not previously been produced.  The Court indicated that it would not require this information then, but would consider ordering Defendants to provide this information with respect to specific documents once the contents of the eight (8) to twelve (12) boxes were known. The Court advised the parties that they would be able to submit

appropriate motions after the documents had been fully reviewed by each, one of which it contemplated was Plaintiffs' Motion to preclude Defendants from using the documents to their advantage.  Plaintiffs' counsel advised the Court that he anticipated that the documents would be favorable to Plaintiffs' case and, therefore, the appropriate motion might be one for sanctions.   However, Plaintiffs' counsel specifically stated at the time of the Pre-Trial Conference, that he did not know the contents of the documents and, therefore, did not want to speculate.   Instead, Plaintiffs reserved their response until after the documents had been received and reviewed.  The Court then ordered Defendants to produce the documents on or before March 1, 1995.

In follow up correspondence, Plaintiffs' counsel asked Defendants's counsel to forward a complete set of the documents to his Springfield office but defense counsel initially refused stating that the documents had to first be reviewed in his office in Kansas City, Missouri.  (Exhibit _1_) Defense counsel eventually relented after Plaintiffs' counsel threatened to schedule a conference call with the Court and agreed to a two (2) day extension until March 3, 1995, for receipt of the documents in Springfield, Missouri. (Exhibit _1_)  Defense counsel did deliver the documents on that date, the first two (2) boxes arriving by overnight delivery and the last two (2) boxes arriving by special courier late in the day.

Beginning on Saturday, March 4, 1995, Plaintiffs' counsel began the arduous task of reviewing thousands of pages of relevant information, much of which proves that what Plaintiffs' experts have been saying for years is not only true, but the opinion of many at Remington. Because of the technical nature of the documents, Plaintiffs' counsel, Richard C. Miller, had to review all four (4) boxes, two (2) of which he did by himself and the other two (2) he did by examining those documents selected by co-counsel Rick Royce and Eric Jensen as

6

potentially relevant. While defense counsel took twenty-six (26) days to review these documents and deliver them to Plaintiffs (assuming they had them no earlier than February 6), Plaintiffs' counsel reviewed the documents in a matter of thirteen (13) days or approximately half the time. Plaintiffs' efforts took an extreme amount of sacrifice both professional and personal. It is estimated that Plaintiffs' counsel, Richard C. Miller, spent well over 50 hours reviewing these documents during this two (2) week period involving at least three (3) nights in which he stayed up most of the night and several days in which he did nothing else. Plaintiffs' counsel, Rick Royce and Eric Jensen, each spent significant additional hours doing the same. What they found is incredible.

IV.   THE DOCUMENTS.

Simply put, the probative value of the untimely production exceeds the cumulative value of all of the documents Plaintiffs' counsel has obtained over the past decade in well over a dozen similar cases in which he has sought this same proof. From "justified" customer complaints to critical committee minutes, damaging memoranda to alternative designs, including some NBAR documents, these four (4) boxes confirm what Plaintiffs in this case and numerous others have been saying about Remington's bolt action rifles for a long time--that they will fire without pulling the trigger. More importantly, they say it much clearer than anything Defendants have previously produced because the authors were actually discussing the problem rather than using language to avoid liability. The 368 documents Plaintiffs selected for their Supplemental Exhibit List also clearly establish for purposes of summary judgment such issues as defective design, negligence, foreseeability of use, knowledge of a dangerous situation and even causation in this case as they support Brock Aleksich's claim that his Model 700

fired when the safety was released.  Other documents directly impugn Defendants'
claim that Brock instead pulled the trigger and, therefore, was the sole cause.

Not only is the probative quality of these documents unequalled by anything
Plaintiffs' counsel has seen before but the quantity is impressive as well.  Of
the 18,443 total documents, approximately 75 percent deal with bolt action rifle
fire controls.  Well over half of these have some relevance to the issues in this
case and the 368 exhibits totalling approximately 1,000 pages are extremely
relevant.   Despite concentrated efforts to digest the mass of information
provided approximately two (2) weeks ago, Plaintiffs' counsel is only now
beginning to understand the significance of this evidence, disclosed three (3)
years too late.

First, Plaintiffs have been able to discern several things from the
organization, format and general nature of documents.  The first and foremost
lesson is that these four (4) boxes of documents were carefully organized and
filed based on subject matter in a number of folders containing labels such as:
Bolt Action Fire Controls, M/700 Modified Connector, Sear Safety Cam M/700,
Process Development-Firearms-Modernization Monthly Report.  The obligation to
produce these files would have been readily apparent to anyone who saw, or made
the file labels.  If they came from more than one source, the individuals
responsible for same had a similar approach to organizing and labelling the
documents.  Certain groups of particular probative documents such as customer
complaints, designer notebooks, and different stages in the development of
Remington's bolt action fire control were clearly segregated into separate files.
Many of the documents are not unique in that they represent one or more copies
provided to a number of people on a general distribution list, meaning that
multiple copies of these documents exist, some times as many as a dozen.

8

A number of familiar names from prior litigation as well as at least one expert from this case appear on the documents including: James Hutton (an expert identified in this case who testifies in all similar litigation and who is identified in Remington's answer to Interrogatory No. 1 (Exhibit ‧ 5 ‧ ) as the only company employee involved in its response), Fred Martin (the main designer of bolt action fire controls over the past 20 years, including the NBAR program, who Plaintiffs have repeatedly deposed at length regarding the subject matter, but not the admissions of these documents); John Linde (an engineer who redesigned both the Model 700 and 600 fire controls before and after the Model 600 recall), Ed Barrett (Head of Research and Vice President of Remington who came out of retirement to testify in the Lewy case in 1986); R. A. Partnoy and Bob Sperling (Remington's General Counsel and Associate Counsel who make damaging admissions regarding malfunctions of this fire control and alternative design work) and both Wayne Leek and Mike Walker (considered the "fathers" of the subject fire control system, also deposed in the past but now allegedly unavailable due to health reasons).

Another important discovery was that documentation of Remington's bolt action rifle fire control problems goes back much farther than Plaintiffs ever suspected. Prior to receipt of these four (4) boxes of documents, Plaintiffs' evidence of Defendants' knowledge of the problem disappeared around 1975 with a few notable exceptions. This newly disclosed evidence establishes that there were problems with the "Walker" fire control system going back to its inception in the 1940's before it was ever manufactured in a commercial rifle. This explains why Mr. Walker made the following comment in his 1950 patent:

> "The value of any safety is proportional to the positiveness of its action. to this and we have found it to be essential that the safety means be so arranged that an inadvertent operation of the

<u>trigger while the safety is in "Safe" position will not condition
the arm to fire upon release of the safety.</u>[emphasis added]"

The new customer complaints recorded by C. Prosser, also explain Defendants' implementation of the 1973 process change Plaintiffs found after reviewing twenty-two (22) boxes of process records years ago. But most importantly, proof of the egregious nature of Defendants' conduct over the past 50 years is now clear and convincing.

Plaintiffs do not have the time, nor does the Court have the patience to examine the significance of each document in Plaintiffs' Supplemental Exhibit List, much less other relevant documents which were produced but are not as probative. Instead, Plaintiffs have selected a limited number of exhibits and have provided a detailed explanation of their significance for the record, entitled "The New Documents" (Exhibit · 3  ). Plaintiffs also incorporate by reference all of the documents identified in Plaintiffs' Supplemental Exhibit List filed with this Motion.

V.    THE CLAIMS.

Plaintiffs in this case and over 60 others have claimed that Remington bolt action firearms utilizing the "Walker" fire control system, particularly the Model 700, but also Models 721, 722, 725, 600, 660, Mohawk 600 and XP100 are defective and unreasonably dangerous because they fire without pulling the trigger. The defective component is the fire control system designed by Mike Walker, patented in 1950, modified by Wayne Leek and used only in these Remington bolt action firearms. This fire control system contains several components, the trigger connector being unique to Remington, which are not reliably controlled in the mechanism. If the trigger connector, trigger or sear are not properly positioned each and every time the firearm is cycled, they will not provide

10

support to the rest of the components and a malfunction will occur.  The primary manifestation of this failure is a firing on safety release (denoted "FSR" by Remington) which Brock Aleksich experienced on  November 12, 1988.   Other malfunctions arising due to failure of the trigger connector and/or other components are Fire On Bolt Closing ("FBC"), Fire On Bolt Opening ("FBO"), and jar-off ("JO"), all of which are documented by literally thousands of complains made to Remington of these occurrences.

Other aspects of the fire control system cause or contribute to cause these malfunctions including the enclosed housing, binding of moving parts, accumulation of contaminants, dried lubrication, condensation or moisture, cold temperature, mismanufactured parts, poor tolerance control, inadequate safety inspections, and an overall failure to warn of the Model 700's propensity to malfunction intermittently and unexpectedly.  The Model 600 series was recalled because of a higher incidence of these problems but Defendants consciously decided not to recall the Model 700 series because the cost would be significantly greater as many more of these rifles were made and are in the hands of the general public.  A detailed explanation of the problems with Remington's bolt action fire controls as understood by Plaintiffs' before this recent production appears in "Plaintiffs' Summary of Designation of Expert Testimony" lodged with this Court on March 17, 1995.

VI.   THE LAW.

In 1958, the United States Supreme Court set the standard for granting a default judgment to sanction a party, stating: "[W]e think that Rule 37 should not be construed to authorize dismissal of this complaint because of Petitioner's non-compliance with the pre-trial production order when it has been established that failure to comply has been due to inability, and not to willfulness, bad

11

faith, or any other fault of Petitioner." <u>Societe Internationale Pour</u>
<u>Participations Industrielles et. Commerciales S.A. v. Rogers</u>, 357 U.S. 197, 210,
78 S.Ct. 1087, 1096 (1958). Despite repeated requests by Plaintiffs to explain
where these four (4) boxes of documents had been stored, who had possession or
control of same and why they had not previously produced, Defendants have refused
to provide this information. (See Exhibits <u>i</u> ). Defendants have never claimed
an "inability" to comply with the Court's order requiring production of these
documents.   They simply did not try.   Failure to disclose these clearly
responsive documents was due to the "fault" of Defendants and given their past
discovery practices, Plaintiffs believe that their conduct was also "willful" and
done in "bad faith".

A party refuses to obey an order of the Court simply by failing to comply
with that order. <u>Societe</u>, at 1094.  Federal Rule of Civil Procedure 37 was
amended in 1970 by substituting "failure" for "refusal" to eliminate any
confusion and reiterate the Supreme Court's opinion that mere failure to produce
documents subjects a party to Rule 37 sanctions.  The "willfulness" of a party's
conduct in failing to produce documents is "relevant only to the selection of
sanctions, if any, to be imposed."  Notes of Advisory Committee on Rules 1970
Amendment.  Once the violation of a Court order has been established, the U.S.
Supreme Court and the drafters of the Federal Rules clearly place the burden on
the violating party to establish "that failure to comply has been due to
inability, and not to willfulness, bad faith or any fault" of their own.
<u>Societe</u>, at 1095.  Defendants' refusal to explain why the documents were not
timely produced does not begin to comply with this burden, particularly when they
were received in the midst of trial preparations.

"The sanction imposed must be 'just' and 'specifically related to the particular claim' which was at issue in the order to provide discovery.'" Shelton v. American Motors Corp., 805 F.2d 1323, 1329 (8th Cir. 1986), citing Insurance Corp. of Ireland v. Compagnie Des Bauxites De Guinee, 456 U.S. 694, 707, 102 S.Ct. 2099, 2106, 72 L.Ed.2d 492 (1982). The four (4) boxes of documents produced cover the gamut of liability issues from establishing defect and negligence to confirming causation by admitting that the experience described by Brock Aleksich can and does occur through no fault of his own. These 18,443 pages which date back to the 1930's contain information regarding the Remington bolt action fire control that has never before seen the light of day. The probative value of that information is greater than all of the liability documents Plaintiffs have otherwise obtained in this litigation (which amount to only recent customer complaints) or its counsel has obtained in ten (10) years of prior bolt action rifle litigation against these Defendants. The documents do not discuss damages, however, so a sanction order in the form of default judgment against Defendants on all liability issues except damages would be directly responsive to Defendants' conduct. Furthermore, it would be "just" because the penalty fits the crime, as will be apparent from a review of the documents themselves.

"Moreover, the record must show a willful and bad faith failure to comply, and that the other party has been prejudiced by that failure." Id. at 1330, citing Edgar v. Slaughter, 548 F.2d 770, 773 (8th Cir. 1977). Defendants have the burden of explaining their conduct. They have refused to do this informally, hence the need for this Motion. At best, they simply did not look for these documents, along with other discovery they were supposed to provide in this case. For instance, Defendants never answered Interrogatory No. 6 ask from whom they

had taken statements, yet had surprised 15 year old Brock Aleksich with the statement of an investigating officer during his deposition. (Exhibit _5_). Despite repeated requests they have not provided a copy of this statement to Plaintiffs despite waiving any work product privilege by reading from it at Brock's deposition.   Despite Court Order no response has been received to Interrogatories Nos. 21 and 22 regarding Defendants' retention policy and missing documents, a particularly important issue now. (Exhibit _5_).  Nor has Remington produced any litigation complaints as ordered with respect to Request For Production No. 3, despite the filing of new cases such as the Blake, Weasel and Tsachalis cases. (Exhibit _6_).

   But at worst, (which Plaintiffs believe is the case) the eight (8) linear feet of paper would never have seen the light of day, had it not been for a third party. The 18,000 plus pages were not produced by the Defendants to this lawsuit- they were produced by "new" Remington for purposes of pending and future litigation in which they are or may be a party.  The Court will remember that on November 30, 1993, all of the assets of Remington Arms Co., Inc., including these documents and the entire plant where they were stored, was sold to a group of investors, the "new" Remington.  Plaintiffs assert that this new company, also known as Remington Arms Co., Inc. located these documents, along with many more that were withheld in yet other Remington litigation and faced with continuing the same conduct which subjects these Defendants to serious sanctions, chose to produce them.  This third party may have given DuPont and Sporting Goods Properties, Inc. (the Defendant previously known as Remington) the option of appearing to have produced the documents voluntarily, but it was the "new" Remington where the documents were stored, found and originally disclosed.  Mr. Shaw has served as counsel for all three (3) parties, including "new" Remington.

14

Not only are Plaintiffs effectively prevented from preparing for trial, so are their experts who will not have time to review and consider these documents before they testify.   But most importantly, all of the hard fought discovery conducted in this and a number of other cases simultaneously, from the deposition of Remington's President, Bobby R. Brown (a former DuPont Vice President), to the depositions of its designers (Mike Walker, Wayne Leek, Fred Martin, etc.) regarding changes in its bolt action fire controls, knowledge of other malfunctions and the NBAR program are at best incomplete.   They are incomplete because Plaintiffs were deprived of the evidence contained in these four (4) boxes, all of which goes to the heart of their claims.   Prejudice is established when a party does not learn of another party's failure to comply with a discovery order until just before trial.   Bankalantic v. Blythe Eastman Paine Webber, Inc., 12 F.3d 1045 (11th Cir. 1994).   In another firearms case this District Court held that "The late tender of discovery responses, particularly in light of their inadequacy, can in no way excuse Defendants' contemptuous refusal to comply in a timely fashion with an order of this Court."   Stanton v. Iver Johnson's Arms, Inc., 88 F.R.D. 290 (1980).   (It also appears from our review of these four (4) boxes that there are yet other documents such as designer notebooks which still have not been produced.)

While this case was filed on January 11, 1991, before the District of Montana's publication of its Civil Justice Expense and Delay Reduction Plan and enactment of Related Amendments to the Rules of Procedure of the Unites States District Court for the District of Montana (effective April 1, 1992), the provisions of Local Rule 200-5, Discovery and Discovery Responses (as amended) are instructive of Defendant's obligations with respect to this matter.   Scheetz v. Bridgestone/Firestone, Inc., 152 FRD 628 (D.Mont. 1993).   Local Rule 200-

15

5(a)(1)(iv) requires pre-discovery disclosure of the "description", including the location and custodian of any tangible evidence or relevant documents that are reasonably likely to bear on the claims or defenses;" and Local Rule 200-5(a)(2) states that this disclosure obligation continues throughout the case requiring a party to "seasonably" supplement its discovery. The first disclosure of the existence of these four (4) boxes of documents came on February 7, 1995, over three (3) years after this Court ordered their production. That is not a "seasonable" response by anyone's definition of the term, particularly when it took another month for actual production on March 3, 1995.

While _Scheetz_ can be distinguished (there was no impending trial) because it dealt with a pre-discovery disclosure statement, its holding is much broader and the intent of this Court cannot be misunderstood. "Rather the obligation imposed by the rule requires a disclosure of the identity of all potential witnesses, documents and tangible evidence [emphasis added] that are relevant to the disputed facts as framed by the pleadings." _Id._ at 633. Furthermore, "Rule 200-5(a)(1)(iv) requires a broader disclosure and contemplates the disclosure of documents and other tangible things in the possession, custody, or control of the disclosing party and any individual entity affiliated with the disclosing party." _Id._ at 635.

In _Scheetz_ the Defendant argued that it did not have to make appropriate disclosures because Plaintiff's counsel already knew of the existence of the documents in question through his representation of other plaintiffs in similar litigation. Even then this Court held that "_Bridgestone/Firestone_ shall not be allowed to effectively defeat the goal of the plan, and necessarily the C.J.R.A., through the mere expediency of declaring that counsel for the adverse party is aware of the information falling within the purview of Rule 200-5(a)(1)(iii) and

16

(iv)." Id. at 633.  That argument cannot even be made in the present case since here Plaintiffs' counsel, despite ten (10) years of effort involving the same Defendants, the same product, the same defect, seeking the same documents did not know of their existence.  That is because despite his opinion to the contrary, Defendants had repeatedly assured him that no additional documents existed.

Finally, the Scheetz case is instructive on Defendants' obligations to advise Plaintiffs of where the documents were stored, who had possession or control of them and why they had not been produced.  Local Rule 200-5(a)(1) requires in sub-parts (i),(iii) and (iv) the disclosure of all of this information informally without Court intervention.  This Defendants have refused to do.

Perhaps the most instructive trial Court opinion regarding the obligations of a party to disclose documents in response to a request for production and subsequent Court order is an opinion by Judge Joseph E. Stevens, Jr., Chief Judge of the United States District Court for the Western District of Missouri  (The home district for Defendants' counsel, John Shaw), directly on point.  In a well publicized opinion issued on November 7, 1994, Judge Stevens, noting he has "spent a considerable portion of the last 5 years serving as a member of the Advisory Committee of Civil Rules of the Judicial Conference of the United States"  (Page 15-16  ) sanctioned Defendant General Motors Corporation by striking Defendant's affirmative defenses and entering an Order establishing all liability facts in favor of Plaintiff.  This is the same sanction requested in the case at hand and our request is not coincidental.  (Exhibit 4 ).

In Baker Plaintiffs had asked GM to produce customer complaints entitled "1241 Reports."  In negotiations regarding this discovery, GM indicated that the reports were only available on computer but represented that the computer

17

database was complete.  The Court ordered GM to produce computer summaries of these customer complaints narrowing the scope of the search to Plaintiffs' particular claim of defect.  GM produced 1241 reports going back to only 1988 explaining that earlier ones did not exist due to a five (5) year retention policy.  Plaintiffs' counsel learned that pre-1988 1241 reports did, in fact, exist because they had been produced in other cases and, consequently, filed their Motion for Sanctions.  GM attempted to explain that there were certain exceptions to the five (5) year retention policy but they were not applicable to the instant case as these reports were not subject to a hold order due to legal proceedings or National Highway, Transportation and Safety Administration (NHTSA) Investigations.  Plaintiffs filed a Supplemental Brief in Support of their motion stating that pre-1988 1241 Reports concerning the subject of their lawsuit were contained in three (3) NHTSA investigation records and, therefore, pursuant to its own policy should have been retained by GM.  Defendant finally produced over 500 responsive pre-1988 1241 Reports shortly  before trial and produced yet others after the trial began.  According to the Baker Court's order the record contained numerous examples of other types of critical documents that were "dumped" on Plaintiffs just before trial, one example being complaints from similar lawsuits.

The similarities between these two (2) cases are striking.  First, in both instances, Defendants "dumped" a tremendous amount of evidence on Plaintiffs just before trial, the only difference being that the Baker Order to produce had only been outstanding for two (2) months, whereas this Court's Order was entered over three (3) years ago.  Some of the documents involved were identical in nature, i.e. investigative reports of customer complaints which Defendants herein call gun examination reports.  Both sets of Defendants claimed earlier customer

18

complaint information was not available due to a record retention policy (Defendants herein have always claimed that customer complaints do not exist before 1978-79 because they had all been destroyed when the three (3) year retention policy was first adopted in 1981). GM came clean only because Plaintiffs forced their hand by proving the existence of earlier customer complaints through independent third parties. Remington and DuPont's conduct was more egregious in that the subject gun examination reports had never been disclosed and, in fact, they had represented repeatedly in this and dozens of other cases that they no longer existed. But most importantly, they would never have been produced now but for the intervention of another third party, "new" Remington.

Standing in stark contrast to numerous prior discovery responses is a single file containing approximately 150 gun examination reports from the late 1960s and early 1970s which admit the malfunctions of which Plaintiffs have complained in many lawsuits. Other complaints interspersed throughout the 18,443 documents were clearly subject to Plaintiffs' as well as the Court's order requiring same but were never been produced in over ten (10) years of litigation in response to similar discovery and Court orders. Defendants in this case should not be allowed to claim that they acted in "good faith" by producing gun examination reports less than a month before trial when they were forced to do so. They had not produced the same information throughout ten (10) years of similar litigation including three (3) years in which they were under an Order of this Court to produce same. Judge Stevens in the Baker case found GM in bad faith for attempting to avoid discovery for a period of a few months, even when they had produced the same documents in other litigation. Defendants' pattern

19

of conduct which has persisted for over a decade should be punished at least as severely as GM.

In a case with a very similar fact situation, the Northern District of California granted Plaintiff's Motion to Dismiss the Defendant's Counterclaim due to Defendant's failure to timely comply with discovery requests. Anheuser-Busch v. Natural Beverage Distributors, 151 F.R.D. 346 (N.D.Cal. 1993).

The Defendant in Anheuser-Busch claimed that certain documents regarding its financial situation had been destroyed by fire. An evidentiary hearing held on the matter revealed that Defendant knew that the documents were not in fact destroyed as early as January of 1990 but waited until after the original trial to retrieve them. Anheuser-Busch 151 F.R.D. at 352. Even after the initial trial, the defendant waited until two months before the re-trial of the case before informing Plaintiff that the documents existed in legible form and did not turn the documents over to Plaintiff until one month before the re-trial. Id.

Defendant argued that Plaintiff was not prejudiced by this failure to produce documents because the documents were produced two months before the trial of the case. The court responded by stating that "...it is well established that belated compliance with discovery orders does not preclude the imposition of sanctions and that last-minute tender of documents does not cure the prejudice to opponents..." Anheuser 151 F.R.D. at 353, citing North American Watch Corp. v. Princess Ermine Jewels, 786 F.2d 1447, 1451 (9th Cir. 1986) and National Hockey League v. Metropolitan Hockey Club, Inc. 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed. 747 (1976) (per curiam).

The Anheuser-Busch court also stated: "Standing alone, 'failure to produce documents as ordered... is considered sufficient prejudice' to justify dismissal." Id. citing Adriana Int'l Corp. v. Thoeren, 913 F.2d 14067, 1412 (9th

Cir.).  "Moreover, '[a] defendant suffers prejudice if the plaintiff's actions impair the defendants ability to go to trial or threaten to interfere with the rightful decision of the case.'"  Id.  The Court found that plaintiff's ability to go to trial was impaired by defendant's failure to produce the requested documents and this Court should likewise find that Plaintiffs' ability to go to trial is adversely affected by Remington's failure to timely produce requested documents.

The Ninth Circuit recognized the necessity for dismissing a case or rendering default judgment due to noncompliance with discovery, even stating that such orders are encouraged.  G-K Properties v. Redevelopment Agency, Etc., 577 F.2d 645, 647 (9th Cir. 1978).  Plaintiffs herein encourage this Court to assess the sanctions requested.  Failure to do so also fails to discourage these Defendants and others from similar conduct in the future.

VI.   THE HISTORY.

In order to understand Defendants' course of conduct with respect to discovery it is necessary to understand the history of Remington bolt action rifle litigation.  While Defendants' failure to disclose extremely relevant and prejudicial documents in the instant case for over three (3) years alone justifies the sanctions requested, their history of similarly cheating Plaintiffs in numerous other cases of the same evidence demands these sanctions.  While Plaintiffs' counsel has only been involved in Remington bolt action rifle litigation since 1984, Remington and/or DuPont have been defending these claims since at least the early 1970s, if not before.  Plaintiffs' counsel is aware of over 100 other injuries or deaths involving the Walker fire control system and over 60 other cases.  While Plaintiffs' counsel cannot state for certain that customer complaints and product research have been requested in every such case,

21

this certainly is a typical area of inquiry for Plaintiffs in any type of product liability litigation. Plaintiffs' counsel can state that in the Remington/DuPont bolt action rifle litigation he has handled in which any significant discovery has been done (some dozen cases) this information has always been sought, yet the subject documents were never produced.

Defendants' tactics regarding discovery have been to delay, deter and deny discovery at all costs and then when there is no other option to simply hide the ball. A prime example of this are the documents generically referred to as NBAR (New Bolt Action Rifle) which took three (3) years and over 20 court orders in half a dozen cases to finally obtain, including a decision by the Magistrate and District Judge in this case. Even though Plaintiffs had routinely asked for alternative design documents in previous cases, Defendants had never disclosed the existence of the NBAR project and the fire control designs worked on under its auspices. Defendants justified this non-disclosure of alternative designs developed to fix the underlying fire control problem by claiming that NBAR was a "totally new rifle" and Plaintiffs had never used the magic word "NBAR." This Court did not buy that explanation nor was it bought in any of the other cases.

The only way Plaintiffs discovered the existence of the NBAR program at all was as a result of finding one single piece of paper with the heading "New Bolt Action Rifle" also referenced as a "Replacement for the Model 700." This single document had not been culled from the Model 700 product files Plaintiffs' counsel reviewed on October 9, 1989. When asked for a copy of this and other "NBAR" documents using the "right" name, Defendants refused and it took three (3) years of litigation including decisions by the Supreme Courts of Texas and Pennsylvania to obtain the NBAR documents. Upon review, Plaintiffs found these documents to be just as they suspected, continuation of Defendants' bolt action fire control

research program which had been culled from the product file to avoid discovery.
NBAR documents were found in the four (4) boxes recently produced but Plaintiffs
have not had time to compare them to the NBAR documents previously produced in
this and other cases to see if they too, are new.

This is not the first instance of Defendants attempt to hide the ball
during discovery.  While Plaintiffs' counsel can cite other examples from his
cases (involving other Customer Complaints, Operations Committee Minutes...)
perhaps it is best to refer this Court to opinions of other Courts which have
sanctioned Remington for discovery abuse.  Plaintiffs will refer to four (4)
separate cases, all of them involving Remington bolt action rifles, in which the
sanctions assessed against Defendant Remington have been increasingly severe.

The first Order is dated November 4, 1983, and entered by the Honorable
Joseph S. Huberty of the Superior Court of Calaveras County, California in
Thomsen v. Messer and Remington.  Remington was sanctioned for failure to comply
with the Court's Order regarding depositions "coupled with the several motions
to compel which have been occasioned by Remington's inexcusable, non-compliance
with legitimate discovery requests, constitute a flagrant [emphasis added]
disregard of the law which has caused a waste of judicial and legal time, have
been obstructive and offensive to the administration justice and unfair to the
other litigants herein." (See Exhibit ___1___).

In Seyferth v. Offenwanger and Remington, filed in the Circuit Court of
Cook County, Illinois, the Honorable Arthur J. Valukas ordered Remington on June
8, 1988, to either provide an Affidavit stating they had kept copies of customer
complaints provided in other litigation, or at least maintained a list of same,
the alternative being to contact all counsel in such litigation and obtain from
them copies of all customer claims that a Model 700 fired on safety release (the

23

same allegation of FSR made in this case).  The Court withheld a ruling on Plaintiffs' Motion to Compel and for Sanctions and although Plaintiffs' counsel herein does not know if any customer complaint information was ultimately produced, the subject complaints certainly were not. (Exhibit __8__ ).

Then on December 14, 1989, the Honorable Frank Orlando of the same Court entered a Sanctions Order after finding that "Remington has <u>unjustifiably</u> and <u>purposefully</u> [emphasis added] failed to comply with its obligation to produce relevant documents in response to document requests and that the plaintiffs and defendants/counter-plaintiff Offenwanger have been substantially prejudiced by Remington's failure to comply with its obligations relating to discovery."  The sanctions ordered included the following: automatic admissibility of exhibits; a preclusion on Remington to explain or impeach the documents and an instruction to the jury that among other things advised them that "Remington unjustifiably failed to produce for and withheld the documents from Plaintiff;"  "Remington only produced the documents to Plaintiff...after Plaintiff...through independent investigation determined that the documents existed;" and "Remington produced these documents for Plaintiff...approximately one week prior to the date in which the case was scheduled for trial."  (Exhibit __9__ ).

The next sanctions orders entered against Defendant Remington were in the case of <u>Craig v. Remington and James</u> which was filed in the District Court of Brazoria County, Texas.  In the first Order entered in that case on February 9, 1989, the Honorable Neil Caldwell found that "Remington has acted in <u>bad faith</u> [emphasis added] and has abused the discovery process, in violation of Rule 215, by failing to produce documents that this Court ordered produced and that Remington's counsel agreed would be produced."  Sanctions assessed for "bad faith" began with a $25,000 monetary penalty payable to Plaintiffs' counsel, an

order to comply with previous orders compelling production, a requirement that Remington file a supplementary response under oath stating that all responsive documents have been produced in compliance with previous orders and agreements of counsel, appointment of a special master paid for by Remington and ended with a warning that "any further abuse of the discovery process by Remington or any failure of Remington to comply with any order of the Court or any request by the special master, will result in an order striking Remington's pleadings and rendering a default judgment against Remington and the imposition of such other sanctions as the Court may find are justified." (Exhibit  10 )

Apparently, Remington did not heed this warning because on March 23, 1990, the Honorable Ben Martinez of the same Court issued his order imposing sanctions on Remington stating: "The Court finds that Remington and its attorney, B. Lee Ware, have acted in bad faith [emphasis added] and have abused the discovery process in violation of this Court's Order of February 9, 1989, and in violation of Rules 166 B and 215 of the Texas Rules of Civil Procedure."  The Court proceeded to impose the sanctions warned about in the prior order finding "bad faith," including: striking Remington's pleadings and rendering a default judgment against it on all liability issues for both actual and exemplary damages; establishing all liability facts in Plaintiffs' favor; precluding any indemnity, contribution or offset in favor of Remington; and preventing Remington from introducing any evidence on these issues. (Exhibit  11 ).  Four (4) days before the same Judge had denied Remington's motion for entry of judgment on a jury verdict in its favor and granted a mistrial on Plaintiffs' motion, as well as its own, because of the "requirements of justice."

The Texas Supreme Court conditionally granted a Writ of Mandamus in Craig to force the trial judge to vacate the default sanction. Remington Arms Company

v. Caldwell 850 S.W.2d 167 (TX 1993). However, it did not disturb the trial court's grant of a new trial despite a defendant's verdict, and left the issue of alternative sanctions to the trial court. In making this decision the Supreme Court relied on procedural issues and not the substance of Remington's behavior during discovery.  The Court stated that nine of the twelve incidents of misconduct occurred before trial and that Plaintiff Craig waived any objections to these matters by failing to request a pretrial hearing on the abuse and by requesting a preferential trial setting. Remington, 850 S.W.2d at 170. Retrial of the Craig case is now pending, with a lot of new evidence.  In the case before this Court, the Plaintiffs filed their Motion for Sanctions and requested a hearing within days of discovering the egregious behavior of Remington.  These Plaintiffs have not waived any objection to Remington's abuse of the discovery process and will not do so.  No technicality exists to excuse Remington's behavior.

As if the Craig case was not enough, Remington had another default sanctions order entered against it on August 21, 1992 in the case of Nigro v. Remington filed in the Court of Common Pleas of Allegheny County, Pennsylvania by the Honorable J. Scheib in which Remington's counsel herein, John Shaw, was also counsel of record.  This order followed the Court's earlier sanctions order dated July 10, 1992, which found that "Remington Arms Company willfully failed to comply with discovery orders dated June 6, 1986 and May 22, 1987 by failing to answer interrogatories and request for production of documents, provide information and produce documents concerning the Model 700 rifle and its predecessor and successor models..." (Exhibit _12_) The July 10, 1992 Order had also granted Plaintiffs' a JNOV, or alternatively, a new trial.  The August 21, 1992 Order held that "Remington Arms Company, Inc., willfully [emphasis added]

26

failed to comply with Plaintiff's request for discovery and with discovery orders dated June 6, 1986 and May 22, 1987, by failing to produce the New Bolt Action Rifle group (NBAR) documents and the Firearms Product and Business Teams documents" and other documents regarding a military version of the same rifle. The Court sanctioned Remington by entering a judgment against them on all liability issues for <u>willful</u> failure to comply with discovery requests and orders regarding these documents and alternatively in the event that JNOV or default judgment are not appropriate, Plaintiff was granted a new trial on all issues for the same reason. (Exhibit <u>13</u>).

In <u>Nigro</u> the trial court found that Remington had violated two discovery orders by not producing any information concerning the military's use of the Model 700 rifle. The NBAR issue was before the Pennsylvania Superior Court, however, the court avoided addressing Remington's failure to produce or even mention the NBAR documents. The Court of Appeals felt that during trial, Remington sufficiently explained its response to the discovery request and held that the trial court and Nigro had accepted that explanation. The Court stated that:

> "It is clear from the record that counsel, although initially arguing that this evidence was not properly produced during discovery, abandoned this tact and reframed his objection as a challenge to the relevancy of the evidence....Any objection he had to the admission of this evidence was waived at trial."

<u>Nigro v. Remington Arms Company, Inc.</u>, 637 A.2d 983, 992 (PA.Super. 1993).

The motion for new trial which was originally granted to the plaintiffs based on Remington's violation of discovery orders was reversed, not based on the merits of the sanction, but upon the phrasing of the discovery by plaintiff's counsel and his waiver of the violation at trial. Remington avoided this serious sanction on another technicality. In the case before this Court, Plaintiffs are

27

presenting their objections to Defendants' violation of discovery orders before trial, without any waiver of their rights and no technicality exists. Plaintiff's discovery requests were appropriately drafted and sustained. Defendants ignored this Court's Order and failed to provide the documents until forced to do so. The <u>Nigro</u> case is presently on appeal to the Pennsylvania Supreme Court. During oral arguments on March 9, 1995, the Supreme Court questioned counsel about the NBAR documents.

## VIII. CONCLUSION.

Despite escalating sanctions, it appears that Remington's conduct has not and will not change regardless of what a trial court does. Even though the two (2) default sanctions are still being litigated, the findings and admonitions of four (4) trial courts regarding Remington's discovery abuses are not diminished. Nor should these trial courts efforts to correct Remington's course of conduct over the past decade be diminished. As before, Defendants' conduct in this case was "willful" and done in "bad faith." Plaintiffs respectfully suggest that their conduct in this case alone justifies the same sanction--a default judgment. If Defendants escape a default judgment in this case, given their flagrant and contumacious abuse of the discovery process, they will only be encouraged to continue this conduct in the future. Somewhere, sometime, somehow a Court must stop this conduct to deter not only these Defendants, but also others from similar conduct in the future. If this Court does not, then the reason and meaning behind Rule 37 and all the discovery provisions of the Federal Rules, voluntary disclosure or not, are in serious jeopardy.

Respectfully submitted,

WOOLSEY, FISHER, WHITEAKER & McDONALD
A Professional Corporation

By _Richard C. Miller_
Richard C. Miller
Bar No. 29595

BURGESS, JOYCE & WHELAN

By _Frank Burgess BY RCM_
Frank Burgess

WOOLSEY, FISHER, WHITEAKER & McDONALD, P.C.
P. O. Box 1245
300 S. Jefferson, Suite 600
Springfield, MO  65801
Telephone:  (417) 869-0581
Facsimile:  (417) 831-7852

29

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was mailed to
all attorneys of record by mailing via UPS next day air, postage prepaid, duly
addressed to their business address on the  22nd  day of March, 1995.

Mr. Frank Burgess
Burgess, Joyce & Whelan
2801 South Montana Street
Butte, MT  59701

Mr. John Shaw
Bryan Cave
3300 One Kansas City Place
1200 Main Street
P.O. Box 419914
Kansas City, MO  64141-6914

Mr. A. Lance Tonn
Lucas & Monaghan, P.C.
P. O. Box 728
Miles City, MT  59301

Mr. Robert Carlson
Coretti, Pohlman, Allen, Black
  & Carlson
P. O. Box 5090
Butte, MT  59703-0509


Richard C. Miller

WOOLSEY, FISHER, WHITEAKER & McDONALD
P. O. Box 1245
300 S. Jefferson, Suite 600
Springfield, MO  65801
Telephone:   (417) 869-0581
Telefax:     (417) 831-7852

02285/89001
F:\afh\remingto\alek.bis

30