IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SHARON TEAGUE and RANDALL TEAGUE, Individually, and in their official capacity as Co-Personal Representatives of the ESTATE OF MARK RANDALL TEAGUE,<br><br>Plaintiffs,<br><br>vs.<br><br>REMINGTON ARMS COMPANY, LLC, REMINGTON OUTDOOR COMPANY, INC., SPORTING GOODS PROPERTIES, INC., E.I. EU PONT DE NEMOURS & COMPANY, DOES A TO K,<br><br>Defendants. | CV 18–184–M–DLC<br><br><br><br>ORDER |

Before the Court are Defendants' Motions in Limine (Docs. 67, 69, 71, 73, and 75) and Plaintiffs' Motions in Limine (Docs. 65, 77, and 83).

## BACKGROUND

Plaintiffs allege that Defendants are strictly liable for the death of Mark Teague due to the "defective, unreasonably dangerous design of the Remington Model 700 and Defendant[s'] conduct in failing to remedy or repair that design, failing to recall these rifles despite many decades of knowledge of its dangers, and

1

failing to warn the consuming public of these dangers." (Doc. 1 at 29.) Plaintiffs seek compensatory and punitive damages under Montana law. (*Id.* at 29–33.)

Strict products liability under Montana law requires the plaintiff to prove: (1) the defendant is a "seller" of the product; (2) the product was in a defective condition that rendered it unreasonably dangerous; (3) the defect caused the accident; and (4) the defect is traceable to the defendant. MONT. CODE ANN. § 27-1-719 (2021); *Brown v. N. Am. Mfg. Co.*, 576 P.2d 711, 716 (Mont. 1978). A "seller" is defined as "a manufacturer, wholesaler, or retailer." § 27-1-719(1).

To recover punitive damages, the plaintiff must prove by clear and convincing evidence that the defendant acted with "actual fraud or actual malice." § 27-1-221. Actual malice requires proof that:

> the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and: (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

§ 27-1-221(2). Actual fraud requires proof that "the defendant: (a) makes a representation with knowledge of its falsity; or (b) conceals a material fact with the purpose of depriving the plaintiff of property or legal rights or otherwise causing injury." § 21-1-221(3).

## DISCUSSION

A motion in limine is a "procedural mechanism" through which questions

regarding the admissibility of "testimony or evidence in a particular area" may be resolved before trial. *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009). Such in limine rulings are preliminary, and the Court "may always change [its] mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000). "Evidence shall be excluded in limine only when it is shown that the evidence is inadmissible on all potential grounds. Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Speaks v. Mazda Motor Corp.*, 118 F. Supp. 3d 1212, 1217 (D. Mont. 2015) (internal quotation marks and citation omitted).

As an initial matter, the Court finds it necessary to define the scope of the alleged defect in this case. The Court will then address the pending motions, beginning with those filed by Plaintiffs.

## I. The Alleged Defect.

The Parties have staked out extreme positions on the nature of the defect in this case. In one briefing, Plaintiffs argue that the alleged defective condition "is the fact that the Model 700 goes off without a trigger pull." (Doc. 124 at 16.) The Court finds this description to be too broad. In contrast, Defendants offer too narrow a definition, stating that the alleged defect is that "*debris* caus[ed] a reduced sear engagement condition in the rifle." (Doc. 70 at 16 (emphasis added).)

3

While debris is one of the "interferences" that Plaintiffs' expert proposes may have caused a misfire in this case, the alleged defect is broader than the specific circumstances of this one instance.

To define the defect, the Court looks first to the Plaintiffs' Complaint. Plaintiffs allege that the Remington Model 700 rifle—the subject of this litigation—utilizes a trigger assembly known as the "Walker Fire Control." (Doc. 1 at 13.) Plaintiffs allege that this trigger design is defective because "[w]hen the rifle is fired the connector separates from the trigger body, creating a gap between the two parts" that can "collect field debris, manufacturing scrap, burrs from the manufacturing process, lubrication applied at the factory, other lubrication or buildup, or moisture." (*Id.* at 14.) This "debris or foreign material restricts the return of the trigger connector to proper engagement under the sear" which can cause the rifle to fire without a trigger pull. (*Id.*) The risk of misfire is "increased by binding and other interferences with connector engagement created by other parts of this fire control . . . [that] are the result of tolerances that Remington has adopted for 'ease of manufacture' and as a cost saving measure." (*Id.* at 14–15.) Such unintended firing can occur under a number of circumstances, commonly referred to as Fire on Bolt Closure ("FBC"), Fire on Bolt Opening ("FBO"), Fire on Safety Release ("FSR"), Fire from Normal Rifle Jarring ("JO"), and Fire Off Safe ("FOS"). (Doc. 1 at 15–16; Doc. 47-4 at 7–8.)

4

Notably, other defective conditions that may cause an unintended misfire were identified by Plaintiffs' expert Charles Powell but were determined not to have caused the misfire in this case.  Those conditions include "low Connector-Sear engagement," "inadequate sear lift," and "post-manufacture adjustment of the housing screws."  (Doc. 47-4 at 9, ¶ 6.9.)  Plaintiffs' theory also excludes any defective conditions associated with misfires when the trigger has been pulled. (*See* *id.* at 14, ¶ 6.14.)

To summarize, Plaintiffs allege that the design of the Walker fire control is defective because "this fire control design includes a Trigger Connector that does not reliably return to full engagement with the Sear each time the rifle bolt is cocked," causing it to misfire without a trigger pull.  (*Id.* at 8, ¶ 6.6.)  The Court approaches the remaining motions in the context of the defect as defined above.

## II. Plaintiffs' Motions in Limine.

### a.  Motion to Exclude Specific Opinions of Derek Watkins

Plaintiffs seek to exclude from trial the opinions of Defendants' liability expert, Derek Watkins, that: (1) "biologic material was present on the outside of the rifle and inside the barrel/muzzle of the rifle;" and (2) "unburnt propellant was present in the inside of the barrel/muzzle of the rifle."  (Doc. 65 at 2.)  Plaintiffs argue that these opinions fail to meet the requirements of FED. R. EVID. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  (*Id.*)

Watkins is an engineering consultant specializing in firearms and ammunition who offered an expert opinion as to the circumstances of Mark Teague's death and whether the subject rifle was defectively designed or manufactured. (Doc. 129-2 at 1, 30.) Watkins examined the rifle's "mechanical components and operation" through "CT scan, 2D radiography, optical measurements, actuation force measurements and physical testing." (*Id.* at 1.) Watkins identified "unburned propellant granules lodged on the surfaces of the interior rifling," (*id.* at 13), and "what appeared to be biological residue stains on the surface of the interior rifling," which led Watkins to conclude that the muzzle of the rifle was in contact with Mark Teague's head at the time it was fired, (*id.* at 14). Ultimately, Watkins concluded that the subject rifle has no design or manufacturing defects, (*id.* at 1), and that "[t]here is no physical or testing evidence to support an allegation that the rifle fired at the time of the decedent's death in any manner other than when the chamber was loaded, the bolt was cocked, the safety was in the 'Fire' position, and the trigger was pulled," (*id.* at 3).

Plaintiffs claim Watkins is not qualified because "[d]etermining the difference between biologic material and not biologic material and unburnt propellant and not unburnt propellant requires specialized knowledge of chemical and biologic testing" that Watkins lacks. (Doc. 66 at 6.) Plaintiffs point to Watkins's lack of experience and formal training in the relevant areas and lack of

qualifications required to perform the relevant chemical analysis.  (*Id.* at 6–7.)

Plaintiffs add that Watkins "did not follow specific and reliable scientific methods,

[so] his testimony on these topics would be speculative and only confuse and

mislead the jury."[1]  (Doc. 66 at 8.)

Defendants contend that Watkins properly relied on Deputy Coroner

Parcell's finding that the muzzle of the subject rifle was in contact with Mark

Teague's forehead, which "provided the means for biologic material and blood to

enter the muzzle of the rifle."  (Doc. 129 at 4 (internal quotation marks and citation

omitted).)  Next, Defendants argue that chemical testing was not required to

identify the presence of biological material and unburnt propellant.  (*Id.* at 5.)

Rather, Watkins relied on "his prior firearms and ballistics experience,"

examination with "an optical camera and a magnifying borescope," and "a process

of elimination."  (*Id.* at 6.)  Defendants also argue that Watkins is qualified to

testify to his findings based on his education in mechanical engineering, years

spent employed at Remington, and experience "as a firearms engineering

consultant and as an expert witness in cases involving firearms and ammunition."

(*Id.* at 16.)  Additionally, Defendants point to Watkins's "expertise in the forensics

and physics of a firearm incident, including root cause analysis and trajectory and

---

[1] In support of their claim that Watkins did not use reliable scientific methods, Plaintiffs have submitted the declaration of Jonathyn Priest (Doc. 66-6).  The Court previously struck the Priest declaration as untimely.  (Doc. 151.)

ballistics . . . , design, simulation and failure analysis . . . , [and] gunshot wounds and the physics that govern them."  (*Id.* at 16–17.)

FED. R. EVID. 702 provides that a qualified witness may offer an expert opinion only if:

(a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) The testimony is based on sufficient facts or data;
(c) The testimony is the product of reliable principles and methods; and
(d) The expert has reliably applied the principles and methods to the facts of the case.

"There 'is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field;'" instead, "the court must determine whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, and whether the opinion will help the trier of fact." *Trujillo v. Cnty. of Los Angeles*, 751 Fed. Appx. 968, 972 (9th Cir. 2018) (quoting *Santos v. Posadas De P.R. Assocs.*, 452 F.3d 59, 63 (1st Cir. 2006)).

*Daubert* provides a framework for determining the reliability of an expert witness's methodology.  509 U.S. 579 (1993).  The following factors are relevant to the *Daubert* analysis: "(1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific community." *Id.*

at 592–94.  In making a *Daubert* determination, the Court is to act as "a gatekeeper, not a factfinder" and should "avoid excluding opinions 'merely because they are impeachable.'"  *Speaks*, 118 F. Supp. 3d at 1218 (citation omitted).

Plaintiffs have failed to demonstrate that Watkins's expert testimony is inadmissible under FED. R. EVID. 702 or *Daubert*.  As this Court discussed in its previous order (Doc. 151), issues regarding the correctness of an expert's opinion go to the weight of the testimony, rather than its admissibility, and are best addressed through cross-examination and counter evidence.  *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1199 (9th Cir. 2014).  Therefore, Plaintiffs' Motion in Limine to Exclude Specific Opinions of Derek Watkins (Doc. 65) is DENIED.

**b.  Combined Motions in Limine**

Plaintiffs' Combined Motions in Limine (Doc. 77) ask the Court to exclude testimony, evidence, or arguments related to:

1. Evidence of Mark Teague's (or anyone else's) negligence.

Ruling: GRANTED IN PART, DENIED IN PART.  Consistent with this Court's ruling in *Bell v. Glock*, 92 F. Supp. 2d 1067 (D. Mont. 2000), and the previous Order in this case:

> Defendants here are permitted to introduce evidence of Mark Teague's conduct as it "relates to what happened in the incident" or to rebut Plaintiffs' claim that the alleged defective design caused Mark Teague's death.  Defendants are not permitted, however, to argue that

9

Mark Teague was contributor[ily] negligent or an intervening/superseding cause of his own death.

(Doc. 151 at 15.)  Defendants may also maintain their affirmative defense of

unreasonable misuse.  (*Id.*)

> 2.  Any testimony from Breanna Johnson and any opinions based on the testimony of Breanna Johnson.

Ruling: RESERVE.  The Court agrees with Defendants that Plaintiffs'

arguments primarily go to the weight of Johnson's testimony, not its

admissibility.  (*See* Doc. 128 at 14).  However, the Court reserves ruling

until an adequate foundation has been laid.

> 3.  Any lay opinions that Mark committed suicide.

Ruling: RESERVE.  Lay witnesses may testify in the form of an

opinion that is: "(a) rationally based on the witness's perception; (b) helpful

to clearly understanding the witness's testimony or to determining a fact in

issue; and (c) not based on scientific, technical, or other specialized

knowledge within the scope of Rule 702."  FED. R. EVID. 701.  Plaintiffs

have not provided sufficient information for the Court to determine whether

such lay witness testimony would be inadmissible on all potential grounds.

> 4.  A video made in the year 2020 of Seeley Lake Community Council Meeting addressing suicide prevention, and an audio recording made in 2017 of a KGBO radio program.

Ruling: RESERVE.  "[I]f the facts or data would otherwise be

inadmissible, the proponent of the opinion may disclose them to the jury

only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." FED. R. EVID. 703.  The Court does not find that these recordings are de facto inadmissible or improperly relied upon by Defendants' experts; rather, their admissibility is dependent upon the context in which they are introduced at trial.  However, the Court notes that each of these programs occurred after Mark's death and, therefore, may be temporally irrelevant.

5. Opinions regarding the Teagues' alleged extended family history of mental health.

Ruling: RESERVE.  The Court agrees with Defendants that Plaintiffs' arguments on this issue generally go to weight rather than admissibility, (*see* Doc. 128 at 20), but reserves ruling on this issue until Defendants have had an opportunity to establish a proper foundation.

6. Opinions that Mark suffered from the contagion effect.

Ruling: RESERVE.  The Court will reserve ruling on this issue until Defendants have had an opportunity to lay a proper foundation at trial, including relevance.  FED. R. EVID. 401, 402.

7. Out-of-context material from Mark's cell phone.

Ruling: RESERVE.  Defendants have conceded that they will not offer certain evidence from Mark's phone, specifically a suggestive photograph of another man, nor will they attempt to argue that Mark was

11

gay.  (Doc. 128 at 21.)  As to the remaining contents of the cell phone, the Court reserves ruling as there may be an appropriate basis for its admission, such as evidence of Mark's state of mind.  FED. R. EVID. 401, 402, 403.

       8.  Testimony from Lt. Dicken.

Ruling: RESERVE.  The Court reserves judgment on this issue; however, any evidence that is duplicative, cumulative, or lacks a proper foundation will be excluded at trial.  FED. R. EVID. 403.

For the foregoing reasons, Plaintiffs' Combined Motions in Limine (Doc. 77) are GRANTED IN PART, DENIED IN PART, and the Court RESERVES on all remaining parts.

### c.  Motion to Exclude or Limit the Expert Testimony of Dr. Sunil Prashar

Plaintiffs' last motion in limine moves for the Court to exclude the expert testimony of Dr. Sunil Prashar, or alternatively, to limit his testimony "to only what is described explicitly within the four corners of his autopsy."  (Doc. 83 at 2.) Plaintiffs further move to prohibit any "other defense witness, expert or otherwise" from testifying "in reliance on the unpermitted testimony of Dr. Prashar."  (*Id.*)

Dr. Prashar is a Forensic Pathologist with the Forensic Science Division of the Montana Department of Justice who performed the autopsy of Mark Teague and filed the official external examination report ("autopsy report").  (Doc 84-4 at 1.)  Dr. Prashar's final diagnosis for cause of death states (1) "Gunshot Wound to

Head" and (2) "Shot Self with .270 Caliber [Rifle]." (*Id.*) Plaintiffs obtained Dr. Prashar's autopsy report through a court order from Judge Larson of the Montana Fourth Judicial District Court, (*see* Doc. 84-3), and provided it to Defendants pursuant to FED. R. CIV. P. 26 and Judge Larson's order. Dr. Prashar is also one of Defendants' disclosed experts.

Plaintiffs argue that the testimony of Dr. Prashar should be excluded or limited because he violated his "public policy responsibilities" of "neutrality, independence, and trust" that he owed as a state employee, "has refused to comply with legitimate and properly served subpoenas of this [C]ourt[,] and has violated the confidentiality requirements of criminal justice information." (Doc. 84 at 1–2.) Plaintiffs allege that Dr. Prashar held "ex parte meetings" with Defendants wherein he "disclosed opinions that he did not include in his official state autopsy report," in violation of Montana law and Judge Larson's order. (*Id.* at 2–3.) Plaintiffs cite to *Jaap v. District Court*, 623 P.2d 1389 (Mont. 1981), and *Hampton v. Schimpff*, 188 F.R.D. 589 (D. Mont. 1999), to support their proposition.

Defendants contend that "Plaintiffs' argument is based on a misinterpretation and misunderstanding of the facts and the law." (Doc. 130 at 2.) First, Defendants argue that they are "not precluded under Montana law from discussing the autopsy report with Dr. Prashar." (*Id.* at 5.) "Judge Larson specifically permitted the report to be 'used as needed in the prosecution of any

product liability claim.'" (*Id.* at 6 (citing Doc. 84-3 at 2).)  Defendants also point out that Plaintiffs "never asserted during discovery that Dr. Prashar's autopsy report was or is confidential" and argue that the cases cited by Plaintiffs do not apply because there was no doctor-patient relationship between Mark Teague and Dr. Prashar.  (*Id.* at 6–7.)

Second, Defendants argue that "Plaintiffs' failure to enforce the deposition subpoena is not grounds for exclusion or limitation of Dr. Prashar's testimony." (*Id.* at 7.)  Defendants note that Plaintiffs contacted a Montana DOJ representative to set a deposition date on either February 26 or 28, but Dr. Prashar was scheduled to be out of the office on both dates.  (*Id.* at 7–8.)  Dr. Prashar then responded that he would be available the week of March 3 and sent Plaintiffs a fee arrangement for the taking of his deposition.  (*Id.* at 8.)  Defendants present that Plaintiffs had no further communication with Dr. Prashar and did not attempt to enforce the deposition subpoenas or otherwise compel Dr. Prashar to appear for deposition. (*Id.*)

Finally, Defendants argue that their "expert disclosure of Dr. Prashar met the requirements of FED. R. CIV. P. 26(a)(2) and the Court's scheduling order," (*id.* at 3), and that there is no basis "to preclude other experts from testifying in reliance on Dr. Prashar's autopsy findings and testing, (*id.* at 11).

MONT. CODE ANN. § 44-5-303(1) limits the "dissemination of confidential criminal justice information . . . to those authorized by law to receive it, and to those authorized to receive it by a district court upon a written finding that the demands of individual privacy do not clearly exceed the merits of public disclosure." "Unless otherwise ordered by a court, a person or criminal justice agency that accepts confidential criminal justice information assumes equal responsibility for the security of the information with the originating agency. Whenever confidential criminal justice information is disseminated, it must be designated as confidential." § 44-5-303(3).

The Court is not convinced by Plaintiffs' arguments to exclude or limit Dr. Prashar's testimony. First, to the extent that there is an argument that Montana law was violated by the dissemination of information contained in the autopsy report, Plaintiffs bear "equal responsibility for the security of the information" as persons authorized to accept such information by court order. The evidence before the Court indicates that Plaintiffs did not designate the autopsy report as confidential.

Second, Judge Larson's order contemplates use of the "confidential criminal justice information relating to a rifle incident that occurred on November 3, 2015, involving [Mark Teague] . . . as needed in the prosecution of any product liability claim." (Doc. 84-3 at 1–2.) The Court understands this language to include both

15

the autopsy report itself and the knowledge of Dr. Prashar as it relates to Mark Teague's cause of death.

Third, the cases cited by Plaintiffs regarding the permissibility of an ex parte meeting between a party's treating physician and opposing council are not applicable here. *Japp* and *Hampton* both stand for the proposition that Montana law prohibits ex parte contact between a treating physician and the defendant and prohibits the defendant from using the treating physician as an expert. 623 P.2d at 322–23; 188 F.R.D. at 591. Here, Dr. Prashar was not a treating physician of Mark Teague and no doctor-patient relationship existed between the two. The rationale of protecting a patient's interest in confidentiality therefore does not apply in this case.

Finally, Plaintiffs have not presented sufficient evidence that Dr. Prashar violated any rules or laws that would warrant his exclusion as an expert witness at trial. Plaintiffs' claim that "[n]ever has counsel been required to pay the kind of fees that Dr. Prashar required," is not sufficient to warrant the relief Plaintiffs seek. (Doc. 145 at 4.) Plaintiffs also try to justify their failure to enforce the deposition subpoenas or otherwise compel Dr. Prashar to appear for deposition by pointing out that Covid-19 lockdowns were in effect at that time and Plaintiffs were in the process of finding new counsel while meeting their other legal obligations related

to this case.  (*Id.* at 5.)  Thus, it appears that Plaintiffs acknowledge they played a role in causing Dr. Prashar's failure to comply with this Court's subpoena.

Accordingly, Plaintiffs' Motion in Limine to Exclude or Limit the Expert Testimony of Dr. Sunil Prashar (Doc. 83) is DENIED.

## III. Defendants' Motions in Limine.

### a. Motion to Exclude Non-Causally Related Defects and Conditions and Other Inadmissible Matters

In this motion (Doc. 67), Defendants move to exclude the following matters:

1. Adjustability of the Model 700 Trigger Mechanism.

Ruling: GRANTED.  Because there is no evidence that this issue is relevant to Plaintiffs' case, (*see* Doc. 125 at 9), the Court will not admit evidence on this matter unless Defendants open the door by arguing that the subject rifle's trigger mechanism had been improperly adjusted.

2. Buildup of Aged or Gummed Lubricants and Debris on the Tip of the Engagement Screw and Smashed Chips.

Ruling: DENIED.  The Court agrees with Plaintiffs that they should not be precluded from "making argument regarding the existence and effect of foreign material, including metal chips," (Doc. 125 at 14), in the subject rifle as these matters go directly to Plaintiffs' theory of the case that some interference prevented the Trigger Connector from returning to full engagement with the Sear. The Court will admit this evidence at trial, assuming the proper foundation is laid.

3.  Inadequate Sear Lift.

Ruling: GRANTED.  Plaintiffs acknowledge that they "do not intend to introduce evidence that inadequate sear lift was the cause of the inadvertent discharge at issue in this case," but only as is relates to Defendants' knowledge "that the Model 700 rifle can and will fire without a trigger pull and is defective." (*Id.* at 15.)  Because there is no evidence the subject rifle had inadequate sear lift, evidence of this defect in other rifles is not relevant to the alleged defect at issue here.  FED. R. EVID. 401.

4.  The "Trick" Condition.

Ruling: GRANTED.  Because the "trick" condition tests for inadequate sear lift,[2] the Court sees no relevance to the alleged defect at issue here.  FED. R. EVID. 401.

5.  The "Screwdriver" Test.

Ruling: GRANTED.  Plaintiffs do not dispute that the subject rifle passed the "screwdriver" test.  (Doc. 125 at 18.)  Again, the Court will not admit this

---

[2] The "trick condition" is described by Defendants as:
> (1) the rifle's manual safety is deliberately placed in a "mid-position" between the "SAFE" and "FIRE positions;" (2) the trigger is then pulled and released; and (3) the safety is then moved forward to the "FIRE" position.  If the firing pin is released upon the movement of the safety to the "FIRE" position, the rifle is said to have failed the "trick" test.  The purpose of the test is to determine whether a rifle has adequate "sear lift."

(Doc. 68 at 10.)

evidence because it is irrelevant to the defect alleged here.  FED. R. EVID. 401.

      6.   Filing, Stoning, or Polishing of the Top of the Connector.

Ruling: GRANTED.  This topic was not addressed in Plaintiffs' expert

Charles Powell's report.  Therefore, testimony on this topic is inadmissible at trial.

FED. R. CIV. P. 26(a)(2)(B).

      7.   Unrelated Remington Rifle Recalls.

Ruling: GRANTED IN PART, RESERVE IN PART.  Plaintiffs will be

required to demonstrate that any evidence regarding recalls of other Remington

rifle models involve substantially similar products and circumstances to those at

issue here.  *Malcolm v. Evenflo Co, Inc.*, 217 P.3d 514, 524 (Mont. 2009)

("Montana law generally allows evidence of similar incidents in product liability

cases when the dispute involves similar products."); *see also Kuiper v. Goodyear*

*Tire & Rubber Co.*, 673 P.2d 1208, 1219 (Mont. 1984) (stating that "[a] concerted

effort should be made . . . to allow the admission of evidence of only those

accidents where both the product and the circumstances surrounding the accident

were similar to the case at bar").  The circumstances of other accidents "need not

be identical to be admissible," *Kruger v. Gen. Motors Corp.*, 783 P.2d 1340, 1346

(Mont. 1989), and similarities "with respect to the design defects alleged" may be

sufficient, *Malcolm*, 217 P.3d at 525.  "[S]ubstantial similarity is required in order

to prevent the jury from being misled," and the offering party bears the burden of

proving such similarity.  *Kuiper*, 673 P.2d at 1219.  This standard is "'relaxed' or 'less strict' when the evidence is proffered to show notice rather than dangerousness or causation."  *Kissock v. Butte Convalescent Ctr.*, 992 P.2d 1271, 1275 (Mont. 1999).

Defendants specifically discuss recalls of the Model 600 and Model 710 series rifles, as well as contemplated recalls of the Model 700 rifle in 1979 and 1994.  (Doc. 68 at 14–16.)  As noted by Defendants, the Eighth Circuit has previously determined that the Model 600 fire controls are not substantially similar to the Model 700 controls.  *Lewy v. Remington Arms Co., Inc.*, 836 F.2d 1104, 1109 (8th Cir. 1988).[3]  The defect alleged in that case involved the susceptibility of the fire control mechanism to fire on release of the safety—FSR.  *Id.* at 1106.  This Court agrees with the Eighth Circuit's analysis in *Lewy* and will prohibit Plaintiffs from introducing evidence of the Model 600 series rifle recall.

Defendants also argue that the voluntary recall of the Model 710 rifle was related to that rifle's "safety detent spring" and "[n]either Plaintiff nor Powell have suggested that the Model 710 recall condition is present in the subject Model 700

---

[3] The Eight Circuit explained that "[t]he evidence before the trial court showed that the dimensions of the M700 and M600 fire controls were different and thus affected the operation of the two fire controls. . . . Thus, the M600 fire control, with component parts of different shape and dimension than those of the M700, cannot be said to be substantially similar to the M700."  *Id.* at 1109.  The court also noted that "when the Model 600 was recalled Remington took out the Model 600 fire controls and 'put in ones that more resembled the Model 700 fire controls,'" and concluded that "[i]t would not make sense for a manufacturer to recall a product because of an alleged design defect and attempt to correct the problem by replacing the defective components with substantially similar components which suffer from the same defect as the original components."  *Id.*

rifle." (Doc. 68 at 15.) Defendants then state that such evidence would be cumulative and prejudicial and therefore inadmissible under FED. R. EVID. 403.[4] (Doc. 68 at 14–15.) Plaintiffs do not respond directly to Defendants' arguments on this matter. The Court will not permit evidence of the Model 710 series rifle recall unless it is shown to be substantially similar and thus will reserve ruling at this time.

Lastly, Defendants argue that the contemplated recalls of the Model 700 series rifle in 1979 and 1994 are not related to the alleged defect in this case. (Doc. 68 at 16.) The Court finds that such evidence may be relevant to demonstrate Remington's state of mind in considering recalls of its Model 700 rifle; however, it would be improper evidence for proving the existence of the alleged defect at issue here if the recalls are not related to the same defect. The Court will discuss the bifurcation of these issues in greater detail below. The Court will reserve ruling until such evidence is offered and an adequate foundation has been laid.

8.   Owner's Manual.

Ruling: GRANTED. "A showing of proximate cause is a necessary predicate to plaintiff's recovery in strict liability." *Riley v. Am. Honda Motor Co.*, 856 P.2d 196, 198 (Mont. 1993). Although "causation is ordinarily a question of

---

[4] Defendants point to *Ahlschlager v. Remington Arms Co.*, where the Texas Court of Appeals affirmed the exclusion of Model 600 recall evidence as prejudicial and cumulative where "[w]itness after witness testified about the Model 700 and about Remington's refusal to recall it." 750 S.W.2d 832, 836 (Tex. Ct. App. 1988).

fact for the trier of fact, it may be determined as a matter of law where reasonable minds can reach but one conclusion regarding causation." *Id.* There is no evidence that Mark Teague ever received or read the Model 700 owner's manual. (*See* Doc. 68 at 17.)  Therefore, any alleged deficiency in the manual cannot be the proximate cause of Mark's death.  Accordingly, the owner's manual is inadmissible as it is not relevant to Plaintiffs' claims.  FED. R. EVID. 401.

       9.  1968 *Consumer Reports* Article Regarding Bolt-Action Rifles.

Ruling: RESERVE.  The assertions contained in the article, if offered "as evidence that Defendants have received countless complaints from the field that the Model 700 can and will fire without a trigger pull because the connector becomes displaced," (Doc. 125 at 28), are not hearsay.  FED. R. EVID. 801(c)(2); *see also Webb v. Fuller Brush Co.*, 378 F.2d 500, 502 (1967) (stating that articles containing the dangers of a defective product were admissible "not to establish that the assertions therein were true, but rather that they should have alerted the [defendant] to possible hazards").  The Court reserves ruling on this motion until Plaintiffs have established the relevance of the defective condition described in the article to the defect alleged in this case.

       10. Use of the Bolt-Lock Mechanism in Pre-1982 Remington Bolt-Action Rifles.

Ruling: DENIED.  The Court finds that the bolt-lock feature is relevant to Plaintiffs' theory in this case because it involves several of the "unintended firing

modes" described by Plaintiffs' expert Powell—FSR,[5] FBC, and FBO[6]—which fall within Plaintiffs' theory of the case.  (*See* Doc. 125 at 29–30.)

11. Model 710 Development Test Results.

Ruling: RESERVE.  There is insufficient evidence to determine whether there is a substantial similarity between the Model 710 testing results and the alleged defect at issue here.  The Court notes, however, that the fact that the testing occurred in a prototype product, alone, is not sufficient to warrant exclusion of this evidence.  (*See* Doc. 68 at 22.)  Plaintiffs maintain the burden of laying a proper foundation, including proving substantial similarity.

12. Regain Issue.

Ruling: RESERVE.  Plaintiffs' argument indicates that the "regain issue" is relevant to the defect alleged here.  (*See* Doc. 125 at 30.)  However, the Court will reserve ruling until a proper foundation has been laid.

---

[5] Powell describes FSR as follows:

> This condition occurs when the Connector has been displaced from full engagement with the Sear step as a result of an interference or from improper manufacturing dimensions within the fire control components.  When the safety lever is in the "Safe" position, this safety component supports the sear, not the Connector.  When the safety lever is moved from "Safe" to "Fire," the unsupported sear immediately drops down, releasing the firing pin, and firing the rifle without a trigger pull.  In essence, the safety lever acts as an unintended second trigger when an interference prevents the Connector corner from proper engagement.

(Doc. 47-4 at 7, ¶ 6.5.1.)

[6] Powell describes FBC and FBO as follows:

> This condition occurs when an interference causes insufficient engagement of the Connector corner with the Sear step and the Connector fails to securely support the Sear.  When the bolt handle is moved from its rest position, either closing an open bolt (FBC) or opening a closed bolt (FBO), the insufficient engagement allows the Connector to dislodge and unintendedly fire the rifle without a trigger pull.  This discharge can occur with only a minor mechanical disturbance of bolt movement.

(*Id.* ¶ 6.5.2.)

23

13. H.P. White Testing.[7]

Ruling: DENIED.  Defendants' arguments regarding this testimony go to weight, rather than admissibility.  Accordingly, the Court will admit evidence derived from the H.P. White testing of the fire control and Defendants may offer impeachment evidence in the form of cross-examination or contradictory evidence. *See, e.g.*, Messick, 747 F.3d at 1199 ("[I]ssues regarding the correctness of [an] opinion . . . are a matter of weight, not admissibility.").

For the foregoing reasons, Defendants' Motion in Limine to Exclude Non-Causally Related Defects and Conditions and Other Inadmissible Matters (Doc. 67) is GRANTED IN PART, DENIED IN PART, and the Court RESERVES ruling on the remaining parts.

### b.  Motion to Exclude Evidence of Other Occurrences, Lawsuits, and Settlements

Defendants move to exclude "reference to other occurrences, lawsuits[,] and settlements regarding Remington bolt-action rifles."  (Doc. 69 at 2.)  Defendants move for exclusion on the basis that these instances are not substantially similar to the alleged defect at issue here and, even if substantially similar, should nonetheless be excluded under FED. R. EVID. 403 and 802.  (Doc. 70 at 12–19.)

---

[7] The H.P. White Test Report states "[t]he post-test, Safety Manipulation Tests failed to recreate a single instance of the inadvertent firings encountered during cleaning.  That result suggests the inadvertent firings may be an infrequent, random phenomena created by debris which is cleared by subsequent manipulation of the Fire Control Group."  (Doc. 125-16 at 6, ¶¶ 3.4.5–3.4.5.1.)

Plaintiffs respond that "[e]vidence of other similar incidents is relevant and highly probative" to show: "(a) that the Model 700 that killed Mark was defective and dangerous, (b) that the Defendants had notice or knowledge of the defect and danger, (c) that the rifle caused the harm, and (d) that the Defendants acted with actual malice or fraud." (Doc. 124 at 3.) Plaintiffs offer examples of some of the similar incidents they intend to introduce, including "a few of the thousands of reports the Defendants have received from their customers." (*Id.* at 15.) Plaintiffs also argue that other lawsuits are evidence of other similar incidents. (*Id.* at 17.)

As an initial matter, the Court notes that through this motion in limine, Defendants seek to "exclude broad categories of evidence," rather than "identify[ing] the evidence at issue and stat[ing] with specificity why such evidence is inadmissible," which this Court has previously criticized. *Ducheneaux v. Lower Yellowstone Rural Elec. Ass'n Inc.*, No. CV 19–6–BLG–TJC, 2021 WL 2109190, at *1 (D. Mont. May 25, 2021).

"[E]vidence of similar occurrences 'might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, the standard of care, and causation.'" *Lewy*, 836 F.2d at 1108; *see also Stokes v. Ford Motor Co.*, 300 P.3d 648, 654 (Mont. 2013) ("Evidence of other similar instances may be admitted to show notice or knowledge of the existence of a danger or defect."); *Preston v.*

25

*Mont. Eighteenth Jud. Dist. Ct.*, 936 P.2d 814, 819 (Mont. 1997) (stating "the existence of similar injuries tends to demonstrate the manufacturer's knowledge of the 'high probability of injury'").  In order to introduce such evidence, Plaintiffs must demonstrate that the other occurrences are substantially similar to the "product and circumstances" in this case.  *Kuiper*, 673 P.2d at 1219.  However, the circumstances of the other occurrences "need not be identical to be admissible," *Kruger*, 783 P.2d at 1346, and the substantial similarity requirement is relaxed "when the evidence is proffered to show notice rather than dangerousness or causation," *Kissock*, 992 P.2d at 1275.

Defendants mention five specific customer complaints in their briefs on this motion—from Bart D'Angelo, Renee Mclure, Charles Morgan, Ed Herlson, and Allen Thrasher.  (Doc. 70 at 23–26.)  Defendants argue that none of these complaining customers knew of the internal condition of their rifle and, therefore, Plaintiffs cannot establish substantial similarity.  (*Id.* at 26.)  The Court disagrees and finds that in four of the five complaints the circumstances and product involved are sufficiently similar as to be admissible here.  All five instances involved a Model 700 rifle misfiring without the trigger being pulled—including FSR, FBC, and JO misfires.  (*See id.* at 23–26.)  Only the complaint filed by Bart D'Angelo appears to be dissimilar because Remington's inspection of that rifle revealed "the trigger mechanism had been altered after leaving the factory."  (*Id.* at

26

25.)

Without more, the Court is unable to rule on the admissibility of all other

occurrences, lawsuits,[8] and settlements.  Plaintiffs are not permitted to introduce

evidence of the total number of customer complaints received by Remington or

lawsuits against Remington, as this would undoubtedly include dissimilar

occurrences.

For the foregoing reasons, Defendants' Motion in Limine to Exclude

Evidence of Other Occurrences, Lawsuits, and Settlements (Doc. 69) is

GRANTED IN PART, DENIED IN PART, and the court RESERVES ruling on all

remaining parts.

### c.   Motion to Exclude Reference to TV, News, Internet Reports, and Class Action Litigation Regarding Remington Bolt-Action Rifles

Defendants filed this motion (Doc. 73) in anticipation "that Plaintiffs may

reference or attempt to introduce or provide testimony regarding the content of

written and televised news reports and programs and/or internet material

discussing Remington bolt-action rifles."  (Doc. 74 at 2.)  Defendants argue that

such evidence is inadmissible hearsay, irrelevant, and unduly prejudicial.  (*Id.*)

Again, the Court notes that Defendants' motion is worded so broadly as to

attempt to "exclude broad categories of evidence" rather than "identify the

---

[8] Defendants also argue that "it is well established that judgments in other cases are 'regarded as hearsay and not within any exception to the hearsay rule.'"  (Doc. 70 at 27 (citation omitted).)  Defendants' assertion is true only insofar as Plaintiffs offer the *judgment* from another case.

evidence at issue." *Ducheneaux*, 2021 WL at *1. However, the Court will address Defendants' arguments to the extent that they have identified at least one of the TV broadcasts that may be offered, "an 'expose' on the cable television channel CNBC, titled 'Remington Under Fire' which first aired on October 20, 2010." (Doc. 74 at 2.)

Defendants cite to *United States v. Hatchett*, wherein the Sixth Circuit affirmed the exclusion of a "segment from a '60 Minutes' television broadcast" on the basis that it was hearsay.[9] 918 F.2d 631, 642 (6th Cir. 1990). The court in that case stated that "despite Hatchett's assertion that he did not intend to offer the videotape for the truth of its contents, there were no other facts in evidence by which to judge its truthfulness. . . . [I]ts truthfulness would have to have been assumed by the jury in order for Hatchett's proffered explanation to have had any validity." *Id.* The court also noted that "there was no way for the government to detect whether the tape had been altered, and the government would have been unable to challenge the accuracy of the broadcast." *Id.* Defendants also cite to a series of decisions wherein federal courts exclude news articles based on hearsay grounds. (*See* Doc. 74 at 4.)

Plaintiffs respond that the CNBC segment "can be used to prove knowledge

---

[9] Defendants incorrectly state that the Sixth Circuit affirmed the trial court's decision to exclude the evidence on "both hearsay and relevance grounds." (Doc. 74 at 3.) The Sixth Circuit actually held that the video tape "was not too remote to be relevant," but nonetheless upheld the trial court's decision on the basis that the evidence was inadmissible hearsay. *Hatchett*, 918 F.2d at 642.

and notice of defect and it also includes admissible statements under [FED. R. EVID.] 804 and 801." (Doc. 127 at 6.) To their first point, Plaintiffs argue that "[t]he media attention to the problem shows Defendants knew about the alleged defects and is further notice to Defendants that injuries were occurring in the field through use of their Model 700 rifles containing the Walker Fire Control." (*Id.* at 6–7.) Plaintiffs cite to *Webb v. Fuller Brush Co.* for the premise that articles offered "not to establish that the assertions therein were true, but rather that they should have alerted the [defendant] to possible hazards," are admissible as non-hearsay. 378 F.2d 500, 502 (1967).[10] To their second point, Plaintiffs argue that statements by Merle Walker, the inventor of the Walker Fire Control, contained in the CNBC segment fall within Rule 804(a)'s exception for declarations made by an unavailable witness because Merle Walker is deceased. (Doc. 127 at 8.) Plaintiffs also argue that Merle Walker's statements fall within Rule 804(b)(3)'s exception for statements against interest because "Walker's comments were contrary to his pecuniary interest as a person who received retirement income from Remington." (*Id.* at 9.) Plaintiffs also argue that media containing statements by Remington employees would fall under Rule 801(d)(2)'s hearsay exception for statements of

---

[10] Plaintiffs acknowledge the unpublished decision in *Granite State Ins. Co. v. Atlantic Richfield Co.*, where the Ninth Circuit distinguished from *Webb* by requiring some independent corroboration of the dangers at issue beyond the statements in the offered articles. 902 F.2d 1578, at *2 (9th Cir. 1990). Plaintiffs distinguish from *Granite State* by pointing out that here, "there are several documents from the Defendants that corroborate their knowledge of the alleged defect." (Doc. 127 at 7 n.1.)

an opposing party.  (*Id.* at 10.)

The Court does not find it necessary, nor possible, to address Defendants'

argument that all "testimony regarding the content of written and televised news

reports and programs and/or internet material discussing Remington bolt-action

rifles" should be excluded.  Without knowing what material Plaintiffs actually

intend to offer into evidence that might fall into this broad category, the Court must

reserve ruling.  The Court is skeptical that any and all publicized material

regarding the Model 700 rifle or Remington lawsuits will be relevant to Plaintiffs'

case or otherwise admissible.  Plaintiffs maintain the burden of establishing a

proper foundation for whatever evidence they intend to offer.  The Court also notes

that there may be some material that is solely relevant to Plaintiffs' claim for

compensatory damages and other material that is solely relevant to Plaintiffs' claim

for punitive damages.  The Court will address this distinction in more detail in the

following section of this Order.

Regarding the CNBC piece discussed by both Parties, the piece appears to

be relevant to prove knowledge and notice of the defect.  To the extent that

statements are made in the CNBC piece that are admissible as non-hearsay or

hearsay exceptions, those statements may be offered for their truth.  Having not

reviewed the particular segment at issue, the Court will reserve ruling until trial

where Defendants may renew their objections.

Accordingly, the Court RESERVES ruling on Defendants' Motion in Limine to Exclude Reference to TV, News, Internet Reports, and Class Action Litigation Regarding Remington Bolt-Action Rifles (Doc. 73).

### d.  Motion to Exclude Punitive Damages Evidence and to Sever Punitive Damages and Veil-Piercing Issues

Defendants move to exclude punitive damages evidence or, in the alternative, to sever punitive damages and veil-piercing issues from the underlying liability phase of the trial. [11]  (Doc. 75.)

Defendants argue that "Plaintiffs lack evidence to justify an award of punitive damages under Montana law." (Doc. 76 at 11.)  In making this argument, Defendants claim that "Plaintiffs' purported 'punitive' damage evidence is irrelevant and inadmissible." (*Id.* at 11.)  The Court has already addressed these arguments by ruling on Defendants' Motion to Dismiss, Motion for Summary Judgment, Motion to Exclude, and Motions in Limine.  The Court is not convinced by Defendants' argument and finds that there is relevant and admissible evidence that goes to the issue of punitive damages.

Defendants then argue that neither DuPont nor Remington can be held liable for punitive damages because they were not the "seller" of the rifle.  (Doc. 76 at 12–13.)  This argument falls outside the scope of this motion.  Even if the Court

---

[11] Defendants also raise arguments as to the constitutionality of a punitive damages award.  These arguments go to Defendants' affirmative defenses and the Court finds it unnecessary to address them at this time.

were to agree with Defendants, that alone does not preclude evidence on the issue of punitive damages because Sporting Goods Properties, Inc. ("SGPI"), is a party to this action as well.  This argument was not raised in Defendants' Motion to Dismiss or Motion for Summary Judgment and there is not an adequate record for the Court to make a ruling on this issue here.  Therefore, the Court will not address Defendants' argument now but will reserve until trial where the issue may be decided as a matter of law or fact.

Defendants also argue that "Plaintiffs should not be permitted to use a punitive damage claim to 'backdoor' evidence of Defendants' conduct that is irrelevant to their underlying strict liability claim." (*Id.* at 13.)  This argument bleeds into Defendants' argument that if the Court does allow evidence of punitive damages, a bifurcated, or even trifurcated, trial is most appropriate pursuant to FED. R. CIV. P. 42(b).  (*Id.* at 16, 18.)  Plaintiffs respond that Montana law applies and requires a single proceeding, (Doc. 134 at 22), and cite to *Malcolm* for the premise that "our system provides for the presentation of evidence regarding liability for compensatory damages and punitive damages to the jury in a single proceeding." 217 P.3d at 532.  Plaintiffs also argue that even under FED. R. CIV. P. 42(b), Defendants have not met their burden to show bifurcation is warranted.

The preliminary question is whether state or federal law applies.  Where a federal court has jurisdiction based on diversity of citizenship, federal procedural

32

rules apply when they "cover[] the point in dispute," *Hanna v. Plumer*, 380 U.S. 460, 470 (1965), so long as there is no conflicting state law that "would substantially affect . . . primary decisions respecting human conduct," *id.* at 475 (Harlan, J., concurring), nor an important state interest in following the conflicting state law, *Byrd v. Blue Ridge Coop., Inc.*, 356 U.S. 525, 536–40 (1958).

This Court has jurisdiction based on diversity of citizenship and there is a federal rule covering the point in dispute, FED. R. CIV. P. 42(b).  Contrary to Plaintiffs' assertion, there is not a conflicting state rule.[12]  Moreover, this Court has previously stated that the "rule governing bifurcation is a clear example of a rule of adjudication, with virtually no impact upon primary conduct."  *Bloxham v. Mountain West Farm Bureau Mut. Ins. Co.*,  43 F. Supp. 2d 1121, 1129 (D. Mont. 1999).  Although the Ninth Circuit has not directly ruled on this issue, there is ample support for holding that bifurcation of liability for compensatory damages and punitive damages is procedural, not substantive.  *See, e.g.*, *Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277, 283 (2d Cir. 1990) (applying Rule 42(b) instead of New York common law requiring that evidence of defendant's wealth be

---

[12] MONT. R. CIV. P. 42(b) mirrors the federal rule.  Additionally, contrary to Plaintiffs' suggestion, *Malcom* does not stand for the proposition that Montana law requires a single proceeding in order to determine the issues of liability for compensatory damages and punitive damages.  Rather, in that case, the Montana Supreme Court acknowledges that Montana law allows for "evidence regarding liability for compensatory damages and punitive damages" to be presented to a jury in a single proceeding.  217 P.3d at 532.  However, the court ultimately held that it is permissible to exclude punitive damages evidence from the trial for tort liability and for a separate jury to then decide the issue of punitive damages.  *Id.*  In the concurring opinion of McGrath, C.J., joined by Leaphart and Warner, JJ., it is made clear that "Montana law provides for a bifurcated process for jurors to assess the amount of punitive damages."  *Id.* (citing MONT. CODE ANN. § 27–1–221(7)).  McGrath goes on to suggest that "[i]n the future, trial courts should consider bifurcating liability issues from punitive damages issues."  *Id.*

admitted only after jury has otherwise determined that punitive damages are appropriate); *Rosales v. Honda Motor Co., Ltd.*, 726 F.2d 259, 261 (5th Cir. 1984) (applying Rule 42(b) instead of Texas law requiring that liability and damages be tried in a single proceeding); *Moss v. Associated Transport, Inc.*, 344 F.2d 23, 25 (6th Cir. 1965) (applying Rule 42(b) instead of Tennessee law requiring that liability and damages be tried in a single proceeding).

Accordingly, the Court will apply the federal rule allowing bifurcation in this case. The next question is whether, under Rule 42(b), the trial should be bifurcated, such that punitive damages issues are determined in a separate proceeding by the same jury immediately after the jury determines tort liability and compensatory damages. Rule 42(b) provides that a federal district court may, "[f]or convenience, to avoid prejudice, or to expedite and economize, . . . order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." FED. R. CIV. P. 42(b).

While Plaintiffs' product liability claim and punitive damages claims both arise out of the wrongful death of Mark Teague, the issue of punitive damages introduces issues of law and fact that are unique from Plaintiffs' liability claim— such as questions of Defendants' state of mind. These issues are irrelevant to Defendants' tort liability and, in some instances, would be prejudicial if introduced during that portion of the trial. Accordingly, the interests of convenience, avoiding

prejudice, and economizing time weigh in favor of bifurcating the trial. However, some evidence may be relevant to both issues and may be introduced in either one or both stages of trial.

The first phase of trial will focus on Defendants' liability for compensatory damages under Montana's law on strict products liability. Evidence addressing whether (1) Defendants are "sellers" of the subject rifle, (2) the rifle was in a defective condition that rendered it unreasonably dangerous, (3) the defect caused the accident, and (4) the defect is traceable to Defendants will be admissible during this stage. MONT. CODE ANN. § 27-1-719; *Brown*, 576 P.2d at 716. For instance, this includes evidence regarding the existence and effect of foreign material, such as metal chips, and any other evidence that tends to make one of these essential elements more or less probable and is not otherwise inadmissible. *See* FED. R. EVID. 401, 402.

If the jury finds for Plaintiffs in the first phase of trial, the second phase of trial will focus on Defendants' liability for punitive damages and determining any amount of punitive damages. This would include evidence relevant to proving whether the Defendants acted with "actual fraud or actual malice" and Defendants' state of mind. MONT. CODE ANN. § 27-1-221; *see also Malcom*, 217 P.3d at 530 ("The defendant's state of mind represents a key element in determining whether a defendant acted with actual fraud or malice."). Such evidence may include

complaints from customers, Remington's own internal documents, safety testing results, decisions regarding recalls of the Model 700 or other models of rifle, articles and reports, and evidence of other occurrences, so long as all of the proffered evidence meets the substantial similarity test and is not otherwise inadmissible.  *See Lewy*, 836 F.2d at 1106–07 (discussing what evidence was before the jury upon which an award of punitive damages could have been based).

 Lastly, Defendants argue that the issues of veil-piercing and/or alter-egos should be reserved for a later phase of trial pursuant to FED. R. CIV. P. 42(b).  (Doc. 76 at 25.)  These issues should not be reserved for the second phase of trial because they are relevant to any award of compensatory damages and any award of punitive damages.  The Court reserves ruling on these issues until an adequate record has been established.  However, Defendants also raise the question of whether Montana or Delaware law on veil-piercing and alter-ego issues applies.  (*Id.* at 26.)  The Court will address this question here.

Defendants argue that Delaware law applies in accordance with MONT. CODE ANN. § 35-14-1501 and the Ninth Circuit's holding in *Volvo Const. Equipment Rents, Inc. v. NRL Rentals, LLC*, 614 Fed. Appx. 876 (9th Cir. 2015). (Doc. 76 at 26.)  Plaintiffs respond that "in a diversity case as here, Montana's conflicts law applies" and "favors Montana's alter ego doctrine over Delaware's." (Doc. 134 at 27.)

A court sitting in diversity applies the choice of law rules of the forum state. *See, e.g.*, *Narayan v. EGL, Inc.*, 616 F.3d 895, 898 (9th Cir. 2010) ("To determine the applicable substantive law, a federal court sitting in diversity applies the choice-of-law rules of the forum.").  Montana's choice of law rules have changed since the time that this case was filed, and Montana law provides that statutes are not retroactive unless expressly declared retroactive by the Legislature.  MONT. CODE ANN. § 1-2-109; s*ee also State v. Hamilton*, 164 P.3d 884, 886–87 (Mont. 2007).  Section 35-14-1501 did not become effective until after Plaintiffs filed their complaint and contains no language of intent to apply retroactively; therefore, this statute does not apply here.

Prior to the enactment of § 35-14-1501, there was no applicable statute.  In the absence of statutory guidance, the Court will look to the decisions of Montana courts prior to the enactment of § 35-14-1501.  Section 307 of the Restatement (Second) of Conflicts of Laws (the "Restatement") states "[t]he local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts."  Although this Court is unaware of any Montana state courts expressly adopting and applying § 307, Montana state courts have applied the Restatement to various other choice of laws questions.  *See, e.g.*, *Buckles v. BH Flowtest, Inc.*, 476 P.3d 422, 425 (Mont. 2020) (applying the

37

Restatement to questions regarding choice of law for issues sounding in tort and stating "[w]here a conflict arises regarding which state's substantive law applies to a particular action, we apply the approach from the Restatement"); *Casarotto v. Lombardi*, 886 P.2d 931 (Mont. 1994), *rev'd sub nom. on other grounds, Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681 (1996), *reaff'd on reh'g, Casarotto v. Lombardi*, 901 P.2d 596 (Mont. 1995) (applying the Restatement to an issue sounding in contract); *see also Phillips v. GMC*, 995 P.2d 1002, 1005 (Mont. 2000) (applying the Restatement and stating "[w]e see no reason to have one choice of law approach for contracts and another for torts").

Accordingly, the Court applies § 307 and determines that the law of the state where Defendants are incorporated applies, which the Court notes is Delaware for Dupont and SGPI.[13]  (Doc. 76 at 26.)  Defendants' Motion in Limine to Exclude Punitive Damages Evidence and to Sever Punitive Damages and Veil-Piercing Issues (Doc. 75) is GRANTED IN PART, DENIED IN PART, and the Court reserves ruling on all remaining parts.

### e. Omnibus Motion

In their Omnibus Motions in Limine (Doc. 71), Defendants seek to exclude reference to all of the following matters:

---

[13] The Court also notes that this is the same conclusion that would have been reached under § 35-14-1501, which states: "(1) The law of the jurisdiction of formation of a foreign corporation governs: (a) the internal affairs of the foreign corporation; and (b) the interest holder liability of its shareholders."

1. Any argument, comment, testimony, reference to or evidence of any kind regarding Remington or DuPont because the parties have stipulated that SGPI was the seller of the rifle.

Ruling: DENIED.

2. Argument, comment, testimony, or reference to the fact that Defendants are incorporated or headquartered outside of the State of Montana.

Ruling: DENIED.  The Court agrees with Plaintiffs that there is no basis under which to exclude this evidence.

3. Speculative testimony, questions, statements, and argument from Plaintiffs about Mark Teague's unwitnessed actions in the moments prior to his death, including testimony from Plaintiffs' experts and speculative and self-serving theories from Plaintiffs.

Ruling: RESERVE.  Under Rule 602, a lay witness must have personal knowledge of the matter to which they testify.  Fed. R. Evid. 602.  However, "[p]ersonal knowledge includes opinions and inferences grounded in observations and experience."  *United States v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015).  Expert witnesses are exempt from the personal knowledge requirement.  S*ee* Fed. R. Evid. 703; *see also Daubert*, 509 U.S. at 592 ("Unlike an ordinary witness . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.").

4. Evidence relating to the fact that any loss suffered by Defendants in this lawsuit is or may be subject to insurance coverage and/or indemnification.

Ruling: GRANTED.  Fed. R. Evid. 411.

5. Any mention of the idea of sending a message to Defendants or corporate America or big corporations and any references to the idea that Plaintiffs represent the little man while Defendants represent the big man, or that this lawsuit represents a David versus Goliath situation.

Ruling: DENIED.  Sending a message is part of the purpose of punitive damages, *see* MONT. CODE ANN. § 27-1-220, and there is no basis under which to exclude the David versus Goliath type argument.  However, such references are only relevant during the punitive damages phase of the trial.  FED. R. EVID. 401.

6. Any reference to the Golden Rule or its equivalent, the Reptile Theory.

Ruling: GRANTED.  Montana state courts have previously stated this type of argument is inadmissible because "it encourages jurors to exercise personal bias rather than objectivity and neutrality based on the evidence presented."  *Lemm v. Goyins*, No. ADV-2004-43, 2005 Mont. Dist. LEXIS 1424, at *5 (1st Jud. Dist. Ct. Mont. Nov. 9, 2005); *see also Patch v. Hillerich & Brasby Co.*, No. CDV-2006-397, 2008 Mont. Dist. LEXIS 116, at *13–14 (1st Jud. Dist. Ct. Mont. Mar. 31, 2008).  This Court has reached the same conclusion.  *See Eriksen v. Wal-Mart Stores, Inc.*, CV 14-155-BLG-SPW, 2017 U.S. Dist. LEXIS 63062, at *6 (D. Mont. Apr. 25, 2017).

7. Reference to documents, tangible things, the contents of documents, or the testimony of persons who have not been properly and timely disclosed in pretrial discovery.

Ruling:  RESERVE.  The Parties' Joint Discovery Plan states that "[t]he

plaintiff's counsel possesses documents and record produced in other litigation

involving the product at issue, and *those materials can be used as if produced in*

*this case*."  (Doc. 30 at 2–3 (emphasis added).)

> 8. Statements that Defendants attempted or moved to exclude certain matters or evidence from consideration or that the Court has excluded evidence.

Ruling: GRANTED.  FED. R. EVID. 403.

> 9. Statements that Defendants or their counsel withheld or wrongfully prevented the discovery of evidence through the assertion of objections, instructions from counsel, claims of privilege, etc.

Ruling: GRANTED.  FED. R. EVID. 403.

> 10. Statements that Defendants are represented by attorneys from Chicago, Illinois.

Ruling: DENIED.  This is a statement of fact.

> 11. Statements regarding any failure of Defendants to call or not call any witnesses over whom Defendants have no control.

Ruling: GRANTED.  The Court grants this motion on the basis that it is

narrowly tailored to only those witnesses over whom Defendants have no control.

> 12. Any reference by Plaintiffs to, or reading by Plaintiffs' expert of, Plaintiffs' Disclosure of Experts and the written report of Plaintiffs' liability expert.

Ruling: GRANTED.  This motion is granted on the grounds that neither

Plaintiffs nor Plaintiffs' expert may *read* these materials into evidence unless

permissible under the Federal Rules of Evidence.  FED. R. EVID. 801, 802, 803(5).

13. Any ex parte statement or report of any person not then and there present in court to testify and available to be cross-examined.

Ruling: GRANTED.  FED. R. EVID. 801, 802, 804.

14. Testimony and opinion from Plaintiffs' liability expert, Charles Powell, on any alleged defective condition and incident causation unless and until this Court and the jury have first heard from the percipient fact witnesses.

Ruling: DENIED.  The Court may "exercise reasonable control over the mode and order of examining witnesses and presenting evidence" but finds Defendants' request unreasonable and unwarranted.  FED. R. EVID. 611.

15. Evidence of any kind that describes or attempts to describe to the Jury a firearm manufacturer's duties and obligations.

Ruling: RESERVE.  "Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them.  Expert witnesses may testify, however, as to industry practice or standards, which is often relevant and admissible." *Muccie v. Dailey*, CV-20-66-BU-BMM, 2022 U.S. Dist. LEXIS 96963, at *3 (D. Mont. May 31, 2022) (internal quotation marks and citation omitted).  Defendants' motion does not make clear the evidence they seek to exclude.

16. Opinion testimony as to the content and meaning of historical SGPI and/or Remington documents.

Ruling: RESERVE.  Without knowing what Plaintiffs' expert will testify to, the Court is unable to rule on this motion.  The Court will require Plaintiffs to lay a proper foundation for any evidence introduced, and Defendants may raise their objections at that time.  Any testimony going beyond an expert's area of expertise,

otherwise outside the scope of FED. R. EVID. 701 and 702, or falling outside of the expert's report will not be admitted.

17. Any reference to the fact that firearm manufacturers are specifically exempted from regulations promulgated by the Consumer Product Safety Commission.

Ruling: GRANTED.  FED. R. EVID. 401, 402, 403.

Accordingly, IT IS ORDERED that Defendants' Omnibus Motions in Limine (Doc. 71) are GRANTED IN PART, DENIED IN PART, and the Court RESERVES ruling on all remaining parts.

IT IS FURTHER ORDERED that Plaintiffs' Motion in Limine to Exclude Specific Opinions of Derek Watkins (Doc. 65) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Combined Motions in Limine (Doc. 77) are GRANTED IN PART, DENIED IN PART, and the Court RESERVES ruling on all remaining parts.  Defendants may not offer testimony, evidence, or argument that Mark Teague, or anyone else, was contributorily negligent or an intervening or superseding cause of Mark's death.  Defendants may offer testimony, evidence, or argument that rebuts Plaintiffs' claim that a defect in the subject rifle was the cause of Mark's death or that Mark unreasonably misused the subject rifle.

IT IS FURTHER ORDERED that Plaintiffs' Motion in Limine to Exclude or Limit the Expert Testimony of Dr. Sunil Prashar (Doc. 83) is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion in Limine to Exclude Non-Causally Related Defects and Conditions and Other Inadmissible Matters (Doc. 67) is GRANTED IN PART, DENIED IN PART, and the Court RESERVES ruling on all remaining parts.  Plaintiffs may not introduce evidence of: (1) the adjustability of the Model 700 trigger mechanism; (2) inadequate sear lift; (3) the "trick" condition; (4) the "screwdriver" test; (5) filing, stoning, or polishing the top of the connector; (6) the Model 600 rifle series recall; or (7) the Model 700 rifle series owner's manual.  Plaintiffs may introduce evidence of: (1) build up of aged or gummed lubricants and debris on the top of the engagement screw and smashed chips; (2) use of the bolt-lock mechanism in pre-1982 Remington bolt-action rifles; and (3) the H.P. White testing results.

IT IS FURTHER ORDERED that Defendants' Motion in Limine to Exclude Evidence of Other Occurrences, Lawsuits, and Settlements (Doc. 69) is GRANTED IN PART, DENIED IN PART, and the court RESERVES ruling on all remaining parts.  Plaintiffs may not introduce evidence of customer Bart D'Angelo's complaint, or the total number of customer complaints received by Remington.  Plaintiffs may introduce evidence of customer complaints made by Renee Mclure, Charles Morgan, Ed Herlson, and Allen Thrasher.

IT IS FURTHER ORDERED that the Court RESERVES ruling on Defendants' Motion in Limine to Exclude Reference to TV, News, Internet

44

Reports, and Class Action Litigation Regarding Remington Bolt-Action Rifles (Doc. 73).

IT IS FURTHER ORDERED that Defendants' Motion in Limine to Exclude Punitive Damages Evidence and to Sever Punitive Damages and Veil-Piercing Issues (Doc. 75) is GRANTED IN PART, DENIED IN PART, and the Court RESERVES ruling on all remaining parts.  Plaintiffs will be permitted to offer evidence on punitive damages.  The trial will be bifurcated into two phases: phase one will be limited to the issue of liability for compensatory damages under Montana's law on strict products liability, phase two will be limited to liability for punitive damages and determining what amount, if any, of punitive damages will be awarded.  The state law where Defendants are incorporated will be applied to the issues of veil-piercing and alter-egos.

Having now ruled on all pending motions in this case and reset jury trial for April 17, 2023 (Doc. 150), the Court reminds the Parties that the Magistrate Judges of this Court are available for a settlement conference, should the Parties so desire.

DATED this 22nd day of November, 2022.

Dana L. Christensen, District Judge
United States District Court